[No. A030282. First Dist., Div. Five. Oct. 29, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
CROSSAN DAVID HOOVER, JR., Defendant and Appellant.

**COUNSEL**

Phillip H. Cherney, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Dane R. Gillette and Landra E. Rosenthal, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KING, J.**—In this multi-issue criminal appeal we hold that the trial court erred in instructing the jury on the elements of legal insanity, but the error was harmless.

Crossan David Hoover appeals from a judgment of conviction for murder (Pen. Code, § 187) and use of a deadly weapon (Pen. Code, § 12022, subd. (b)). We affirm.

The killing occurred within the context of a bizarre conspiracy, led by Mark Richards, for a paramilitary takeover of Marin County and creation of a modern-day Camelot with Richards as King Arthur and his crew of teenaged construction workers as his knights. Richards, a 29-year-old contractor, employed a number of teenagers, including 17-year-old Hoover. In

regular meetings Richards promoted his plan to isolate Marin County by destroying the Golden Gate and Richmond-San Rafael Bridges and to defend the new kingdom through the use of laser guns placed on Angel Island and Mt. Tamalpais. The conspiracy was called Pendragon.[1]

Richards developed financial difficulties in mid-1982. He decided to kill his friend Richard Baldwin in order to obtain money. Baldwin was known to carry large amounts of cash.

After failing in an attempt to solicit two of his followers to kill Baldwin, Richards turned to Hoover and another teenaged employee, Andrew C. He told them Baldwin owed him money and was a "Nazi" and a "faggot," and it "would be a service to the public to get rid of such a menace." The two agreed to participate in the killing in exchange for a share of proceeds from the sale of property to be taken from Baldwin's house, as well as lodging in a remodeled portion of Richards's house. Hoover later stated he had expected to receive $5,000, a car, and a place to live.

On July 6, 1982, Richards drove Hoover and Andrew to Baldwin's house to work on a construction job there. In the afternoon, pursuant to a plan devised by Richards, he asked Baldwin to show him and Hoover classic cars located in Baldwin's auto shop. The three left around 2 p.m. in Richards's truck. Andrew stayed behind and searched the house.

At the shop, upon a prearranged signal from Richards, Hoover struck Baldwin on the head with a baseball bat. Hoover then stabbed Baldwin in the head with a screwdriver and in the chest with a chisel.

Richards and Hoover returned to Baldwin's house. With Andrew, they took $3,000 in cash and various other items from the house, including guns and marijuana. Later that day Richards bought a boat, using Baldwin's money to make a down payment. He and the two teenagers retrieved Baldwin's body from the auto shop and used the boat to dump the body in San Francisco Bay.

Over the next few days Hoover admitted the killing to several persons. Baldwin's body was found on July 13. The next day the Marin County Sheriff's Department received an anonymous telephone call which led to the arrest of Hoover and Richards on July 16.

An information charged Hoover, as an adult, with murder and use of a deadly weapon. He pleaded not guilty and not guilty by reason of insanity.

---

[1]Pendragon is primarily known as the title of King Arthur's father, Uther Pendragon, but may also refer to any ancient British or Welsh leader holding or claiming supreme power. (7 Oxford English Dict. (1933) p. 638.)

Richards was tried separately, and shortly before Hoover's trial was convicted of first degree murder. Andrew received immunity in exchange for a statement and trial testimony.

Hoover's jury trial was bifurcated into a guilt phase and a sanity phase. At the close of the guilt phase the jury convicted him of first degree murder and use of a deadly weapon. Five days later the jury found Hoover was not legally insane at the time of the killing. The court sentenced him to a term of 26 years to life.

## I.

Hoover contends the judgment must be reversed as to the question of insanity because of error in the court's instruction on the elements of legal insanity.

Penal Code section 25, subdivision (b), added by Proposition 8 on June 8, 1982, provides that the defense of insanity "shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act *and* of distinguishing right from wrong at the time of the commission of the offense." (Italics added.) In accordance with the conjunctive language of the statute, the trial court in the present case instructed the jury that both of the prescribed elements were required for a finding of legal insanity.

The California Supreme Court subsequently held, however, that the electorate intended to return the California law of legal insanity to the traditional M'Naghten test, under which a finding of insanity requires only the presence of *either* of the two prescribed elements. (*People* v. *Skinner* (1985) 39 Cal.3d 765, 775-777 [217 Cal.Rptr. 685, 704 P.2d 752].) The Supreme Court characterized the use of the conjunctive "and" rather than the disjunctive "or" as "apparently inadvertent." (*Id.*, at p. 777.)

Thus in the present case the trial court erred in instructing the jury on the elements of legal insanity, and the Attorney General concedes the error. The question presented is whether the error was prejudicial. Reversal on the insanity issue is required only if it is reasonably probable that a finding of insanity would have been made absent the error. (*People* v. *Leever* (1985) 173 Cal.App.3d 853, 869 [219 Cal.Rptr. 581]; see *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)[2]

---

[2]The court in *People* v. *Leever, supra,* 173 Cal.App.3d at pages 869-870, reasoned that the *Watson* test applies by analogy to its application in previous cases where the M'Naghten test was erroneously used instead of the less stringent American Law Institute test adopted in *People* v. *Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318].) Hoover and the Attorney General both agree that the *Watson* test applies here.

More specifically, the only issue on appeal is whether it is reasonably probable the jury found Hoover was incapable of distinguishing right from wrong at the time of the killing. As the court explained in *Leever*, "had the jurors been persuaded that [defendant] did not know the nature and quality of his act . . ., the instruction [requiring both elements] would have been harmless as a matter of law, for 'a person who is unaware of the nature and quality of his act by definition cannot know that the act is wrong. In this circumstance the "nature and quality" prong subsumes the "right and wrong" prong.' (Fn. omitted, *People* v. *Skinner, supra,* 39 Cal.3d 765, 777-778; cf. *People* v. *Richardson* (1961) 192 Cal.App.2d 166, 172-173 [13 Cal.Rptr. 321].) Thus, the only potential harm in the instruction would be the converse situation—that is, if they found that he did not know his act was wrong but nevertheless found him sane because they believed that he knew the nature and quality of his act." (173 Cal.App.3d at p. 869.) If it is not reasonably probable that the jury found Hoover was incapable of distinguishing right from wrong at the time of the killing, then the instructional error was harmless.

Two key factors demonstrate an absence of prejudice in this regard: (1) Hoover's own comments several months after the killing, indicating an awareness at the time of the killing that the act was wrong, and (2) the equivocal nature of testimony by the only defense expert to testify on the sanity issue.

Defense counsel conceded in closing argument on the sanity issue that "since the time of the homicide . . . Crossan Hoover realizes that what he did was wrong." Hoover's defense was *temporary* insanity. Counsel argued that just prior to the killing Hoover slipped into a temporary psychotic state which rendered him legally insane *at that time*.

In September 1982, however, Hoover made the following comments to a clinical psychologist regarding his state of mind just before the killing: "It was like [Richards] was coaching me. He would listen to what I said and push me on. When I was with Baldwin, I kept thinking this is the guy standing between me and money. It made me excited. I thought about guns I could buy and all the other stuff. *I knew it was wrong, but I didn't give a shit.* Did you ever think of getting $5,000? Did you ever think of wanting to be with your mother? My mother could come back to Marin County. I could have my own room so I wouldn't have to look at her all the time. Oh, man. I was just thinking of how happy I'd be, how much love I would get, how many things I'd have." (Italics added.)

This admission of contemporaneous knowledge of wrongfulness clearly demonstrates Hoover was capable of distinguishing right from wrong at the

time of the killing, and the prosecutor made it a fundamental part of his closing argument on the insanity issue. Hoover claims the statement could be construed as indicating awareness of only legal wrongfulness and not moral wrongfulness. (See *People* v. *Skinner, supra,* 39 Cal.3d at p. 783.) But nothing in the statement suggests Hoover was referring only to legal wrongfulness, and the contrary is suggested by another comment by Hoover, to a psychiatrist, that killing "just takes a few minutes, but it fucks with your conscience."

In cross-examining a prosecution expert, Hoover's trial counsel brought out the fact that the expert's written report of a January 1983 interview with Hoover indicated Hoover said, "He thought at the time that it was not wrong; that Richards told him to do it 'for the better of the country.'" Despite this comment, however, the report concluded "it is obvious from my interview with him and from the reports I have read as well, that he does, *and did at the time, appreciate that what he was doing was wrong,* so far as his taking the life of another person was concerned; however, he felt that greater benefit might come to mankind if he continued to carry this out, but this was not as the consequence of a delusion or hallucination." (Italics added.) In light of the examining doctor's conclusions, Hoover's comments to him did not significantly lessen the impact of Hoover's September 1982 admission that he knew the killing was wrong.

Other comments by Hoover also indicated he was capable of distinguishing right from wrong at the time of the killing. Hoover told a psychiatrist "he was uneasy from the moment of the killing, like there were butterflies in his stomach." This indicates awareness of wrongfulness at the moment of the killing. The same could be said for Hoover's comment that killing "fucks with your conscience," although it is not entirely clear whether this referred to contemporaneous or subsequent state of mind.

In contrast to the compelling nature of Hoover's own comments, the only expert who testified for the defense at the sanity phase was equivocal on the "right from wrong" issue.

When defense counsel first asked whether Hoover was capable of distinguishing right from wrong at the time of the killing, the witness answered only that "I'm not sure I could answer that except to say that he—what he was doing, he felt, was right. He had been conditioned for that." When counsel repeated the question the witness answered, "Well, I'm sure he wasn't even thinking of that at the time of the act." This was followed shortly by the following colloquy: "[The witness.] I'm of the opinion that he was conditioned not to be thinking about those sorts of things. That he was conditioned to feel at a gut level that what he was doing was necessary.

■ [Defense counsel.] So based upon that conditioning, would it be your answer to the question that he did not know that he was doing was wrong? [¶] [The witness.] *Under those circumstances,* yes." (Italics added.) On cross-examination, when confronted with Hoover's prior admission that "I knew it was wrong, but I didn't give a shit," the witness never denied that the statement indicated contemporaneous awareness of wrongfulness, but simply emphasized the part of Hoover's statement that referred to coaching by Richards.

Thus the defense expert never asserted unequivocally that Hoover was incapable of distinguishing right from wrong at the time of the killing. The witness was unequivocal only to the extent he asserted Hoover was "conditioned" not to think about right and wrong but instead to feel that the killing was "necessary." The expert's single assertion of unawareness of wrongfulness was qualified by the phrase "under those circumstances," apparently referring to such conditioning. This was not an assertion of *incapability* of distinguishing right from wrong, but simply one of conditioning not to think about it.

In light of the equivocal nature of the defense expert's testimony, as contrasted with the compelling nature of Hoover's own statements demonstrating contemporaneous awareness of wrongfulness, it is not reasonably probable the jury found Hoover was incapable of distinguishing right from wrong at the time of the killing. The instructional error was harmless.

## II.

■ Hoover next challenges the propriety of the prosecutor's assertion in closing argument at the guilt phase that Hoover committed the killing for financial gain. He relies on the same prosecutor's purportedly inconsistent assertion in closing argument at the Mark Richards trial that Richards's relationship with Hoover revolving around the Pendragon conspiracy enabled him to manipulate Hoover into killing Baldwin. Hoover asserts several legal theories: (1) the shift in theory at Hoover's trial constituted prosecutorial misconduct and a denial of due process, (2) the prosecutor should have been bound to the Pendragon theory under principles of collateral estoppel, and (3) the prosecutor's assertion of the Pendragon theory at the Richards trial compelled a finding at Hoover's trial that Hoover was legally insane as a matter of law.[3]

Even assuming these novel arguments are cognizable on appeal despite Hoover's failure to assert them below, each is meritless.

---

[3] In order to permit consideration of these issues, we take judicial notice of the record on appeal in *People* v. *Richards* (Cal.App. A028291, app. pending).

First, no rule of misconduct or due process binds a prosecutor to a theory asserted in closing argument in a related prosecution. ■ Broadly speaking, "The right of counsel to discuss the merits of a case, both as to the law and facts, is very wide, and he has the right to state fully his views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom. The adverse party cannot complain if the reasoning be faulty and the deductions illogical, as such matters are ultimately for the consideration of the jury." (*People* v. *Beivelman* (1968) 70 Cal.2d 60, 76-77 [73 Cal.Rptr. 521, 447 P.2d 913], overruled on other grounds in *People* v. *Green* (1980) 27 Cal.3d 1, 33-34 [164 Cal.Rptr. 1, 609 P.2d 468], quoting *People* v. *Eggers* (1947) 30 Cal.2d 676, 693 [185 P.2d 1], and *People* v. *Sieber* (1927) 201 Cal. 341, 355-356 [257 P. 64].) ■ At Hoover's trial his counsel was as free to argue a Pendragon theory as was the prosecutor to argue the financial gain theory.

Second, the Mark Richards's judgment could not have had the claimed collateral estoppel effect or have established that Hoover was insane as a matter of law, because Hoover's motive and sanity were not issues that were "necessarily decided" at the Richards's trial. (*People* v. *Taylor* (1974) 12 Cal.3d 686, 691 [117 Cal.Rptr. 70, 527 P.2d 622].) Hoover concedes his insanity was not necessarily decided, but argues "it may be implied that an issue 'necessarily decided' at the Richards trial was that he was found guilty of murder on the People's theory that he manipulated Crossan Hoover into committing the crime by brainwashing him to believe he was doing it for Pendragon." It is impossible to know, however, the theory upon which the Richards jury reached its verdict.

Finally, the prosecutor's theories at the Richards and Hoover trials varied, but they were not necessarily inconsistent. At the Richards trial the prosecutor's theory was that due to the relationship between Richards and Hoover revolving around the Pendragon conspiracy, Richards "was able to manipulate Crossan Hoover into the position where he actually killed a man." At Hoover's trial the prosecutor conceded, consistently, that "Mr. Richards manipulated Crossan Hoover," but added that "there is a far difference between manipulation and *control* in the sense that what the defense is trying to argue and urge upon you . . . ." (Italics added.) Even assuming that fundamental notions of fairness and due process should preclude a prosecutor from asserting diametrically opposed theories in related prosecutions, nothing of the sort occurred here.

### III.

■ Hoover contends the court erred when it instructed the jury that the present action was "not a case which involves the death penalty."

The challenged instruction occurred during jury voir dire, after a prospective juror, on a written questionnaire, expressed reservations about the ability to sit as a juror if the case involved the death penalty. Over defense counsel's objection the court gave the following instruction: "One of the jurors expressed some concern in the answer to a question given on the questionnaire as to whether or not this is a case which involves the death penalty should the defendant be convicted. It is not a case which involves the death penalty, and, incidentally, the matter of penalty is something which the jury must not permit to enter into its discussion or determination of the case in any way."

At the close of the guilt phase the court again instructed the jury, "As I advised you at the onset of the trial, this is not a case involving the death penalty. In your deliberations, the subject of penalty or punishment is not to be discussed or considered by you. . . . This is a matter which must not in any way affect your verdict."

Hoover contends the challenged instruction violated the rule precluding jury consideration of a defendant's possible punishment. (See *People* v. *Holt* (1984) 37 Cal.3d 436, 458 [208 Cal.Rptr. 547, 690 P.2d 1207].) He further argues the purported error was prejudicial because the jurors might have become more likely to convict because they knew he would not be executed.

Hoover's assertion of prejudice, however, cuts two ways. Another way of stating his complaint is that the court deprived him of the reluctance to convict that the jurors might have harbored had they not been assured the case did not involve the death penalty. In view of the rule precluding jury consideration of possible punishment, this concern is not legitimate.

Regardless of the contradictions inherent in Hoover's assertion of prejudice, the court did not err. The subject of the death penalty was raised not by the court or prosecutor but by a prospective juror, and failure to address and dispel this person's concerns might have resulted in improper consideration of such punishment by the jury ultimately selected.[4] Any potential for harm was averted by the court's immediate and subsequent admonitions that the jury was not to consider the subject of punishment in its deliberations. (Cf. *People* v. *Holt, supra,* 37 Cal.3d at p. 458 [court failed to cure error from prosecutor's reference to punishment by admonishing jury not to consider penalty].) Given the need for a response to the prospective juror's concerns, coupled with the giving of the appropriate admonishments, the court did not err in proceeding as it did.

---

[4]An instruction to the concerned party alone rather than to the entire panel would not necessarily have been "less intrusive" as asserted by defense counsel at trial, as that person might have passed the instruction along to ultimate jurors.

## IV.

Hoover contends in his opening brief that the trial court abused its discretion in denying a motion for a change of venue. Hoover made the motion prior to jury selection, based on media coverage of the recently completed Mark Richards's trial and media references to a suppressed confession by Hoover. (See, e.g., *Martinez* v. *Superior Court* (1981) 29 Cal.3d 574, 577-578 [174 Cal.Rptr. 701, 629 P.2d 502].) The court denied the motion, subject to reconsideration should the use of written questionnaires reveal extensive public exposure to the pretrial publicity.

At the close of voir dire, defense counsel requested and was afforded time to discuss with Hoover the present composition of the jury and the change of venue motion. Counsel then passed the jury without renewing the venue motion.

The Attorney General correctly points out that Hoover waived any claim of error by declining to renew the venue motion at the close of voir dire. (*People* v. *Staples* (1906) 149 Cal. 405, 412 [86 P. 886], disapproved on another point in *People* v. *Newland* (1940) 15 Cal.2d 678 [104 P.2d 778] and *People* v. *Daugherty* (1953) 40 Cal.2d 876 [256 P.2d 911].) "[I]t is no error for the trial court to postpone the consideration of an application for a change of venue until an attempt is made to impanel the jury, where leave is granted to counsel to renew his application if the facts disclosed on the impanelment should further warrant it, and . . . where counsel fails thereafter to renew his motion, he cannot claim that error was committed by the court in failing to order a change of venue." (*Ibid.*; see *People* v. *Wallace* (1936) 6 Cal.2d 759, 763 [59 P.2d 115].) The failure to renew a temporarily denied motion for a change of venue is "an abandonment and waiver of the whole question, and fatal to any claim based upon the original application." (*People* v. *Staples, supra,* 149 Cal. at p. 412.)

In his reply brief Hoover concedes the Attorney General's "procedural points on failure to renew the motion for change of venue are well taken." Hoover argues, nevertheless, that the court should have granted his motion immediately, before voir dire, because grounds for a change of venue existed at that time. It is settled, however, that the court was authorized to proceed as it did and defer a final ruling pending the examination of prospective jurors and a determination of the effect of pretrial publicity upon them. (*People* v. *Wallace, supra,* 6 Cal.2d at p. 763; *People* v. *Staples, supra,* 149 Cal. at p. 412.)

Because defense counsel declined to renew the change of venue motion at the close of jury selection despite being given an opportunity to do so, no error is cognizable on appeal.

## V.

 Finally, Hoover contends the court erred by denying a request for examination of a juror for possible misconduct.

The misconduct issue arose at the end of the first day of deliberations on the insanity issue, when a bailiff reported certain observations of Juror R.L. The next morning the bailiff testified as follows: She had entered the jury room several times during the previous day. The first time, when she entered to receive a note for the judge, she noticed R.L. "in a corner of the jury room . . . in the drapes with the drapes wrapped around him facing its corner." When she returned five or ten minutes later, R.L. was "sitting in the same place without the drapes wrapped around him facing the corner." When the bailiff subsequently brought the jurors their lunches, she saw R.L. sitting in the same spot, though not facing the corner. In the afternoon the bailiff brought the jurors to the courtroom. When she entered the jury room R.L. was "in the corner once again with his head down and his arms kind of over his head, facing the wall." Two jurors approached him and seemed to comfort him, and then he got up and walked with the jurors into the courtroom, where he took a seat away from the rest of the jurors. The bailiff never heard R.L. say anything.

Defense counsel, contending the bailiff's testimony indicated R.L. was not participating in deliberations, requested either (1) replacement of R.L. with an alternate juror, (2) courtroom examination of R.L., as well as the jury foreperson and "as many jurors as necessary," or (3) a mental and physical examination of R.L. The court denied the motion, subject to reconsideration at the end of the day after further deliberations and additional observation by the bailiff. The jury reached its verdict before the day ended. On appeal Hoover contends the court should have permitted a courtroom examination of R.L.

 A court must conduct "an inquiry sufficient to determine the facts . . . whenever the court is put on notice that good cause to discharge a juror may exist." (*People* v. *Burgener* (1986) 41 Cal.3d 505, 519 [224 Cal.Rptr. 112, 714 P.2d 1251].) For example, in *Burgener* the foreperson's report to the trial judge that a juror had seemed intoxicated during deliberations was "sufficient to raise the possibility" that the juror was unfit for the proper discharge of her duty. (*Id.,* at p. 520.)

In the present case the trial judge gave four persuasive reasons for concluding there had been no indication of nonparticipation: (1) R.L. had been a college drama student (as learned in voir dire), and during the six-week trial the judge observed he "sort of displays . . . that ham actor kind of

attitude . . .," (2) R.L. had participated in deliberations on the guilt issue with no complaint or appearance of irregularity, (3) the conduct described by the bailiff indicated no more than commonplace "temporary withdrawal from active participation," and (4) there had been no complaints by the foreperson or any other jurors, and the court had "every reason to believe that, if there is anything untoward that has occurred or is occurring, that they would call that to the court's attention." (Cf. *People* v. *Burgener, supra,* 41 Cal.3d at pp. 516-517 [foreperson complained of misconduct].)[5]

For the reasons cogently stated by the trial judge, the bailiff's testimony was insufficient to raise the possibility of nonparticipation by R.L. In particular, after six weeks of trial the judge was in a far better position than we are to evaluate R.L.'s demeanor and to decide whether his fellow jurors would likely have reported any misconduct, and the trial court's conclusions on these points are entitled to substantial deference. We conclude, as did the trial court, that the bailiff's testimony was insufficient to require further inquiry into the possibility of misconduct.

The judgment is affirmed.

Low, P. J., and Haning, J., concurred.

A petition for a rehearing was denied November 19, 1986, and appellant's petition for review by the Supreme Court was denied February 25, 1987.

---

[5]It is also noteworthy that R.L. answered questions intelligently and lucidly during voir dire.