[No. A023897. First Dist., Div. Four. July 31, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
MILTON L. McGHEE, Defendant and Appellant.

[Opinion certified for partial publication.*]

---

* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of sections IIB, D, E, G, H, and I.

COUNSEL

John Doyle, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Eddie T. Keller, George C. Spanos and Bruce M. Slavin, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SABRAW, J.—Defendant was convicted of three counts of grand theft. (Pen. Code, § 487.) He appeals from the judgment of conviction arguing: (1) the information against him was filed beyond the required statutory time limit (Pen. Code, § 1382, subd. 1; (2) insufficient evidence was presented at the preliminary hearing to hold him to answer on two of the charges; (3) his motion for change of venue was erroneously denied; (4) his motion to sever was erroneously denied; (5) improper jury instructions were given; (6) improper rebuttal testimony was introduced; (7) improper testimony from defendant's state bar hearing was introduced; and (8) his *Wheeler* motion was erroneously denied. We find these arguments have no merit and affirm the judgment of conviction.

## I. FACTS AND PROCEDURE

The facts center around a series of improper loan transactions (the CET transaction and the Janmohamed transaction). We address first the facts concerning the CET transaction.

Defendant was the attorney and secretary for a real estate investment known as Commonwealth Equity Trust (CET). The trust used money from individual investors to buy real estate. Loans, payments and any type of self-dealing were prohibited by the trust agreement.

However defendant, in need of money to pay off a lawsuit settlement in an action brought against him by a former client, arranged to borrow money using CET assets as collateral. He contacted the manager of a Sacramento branch of Lloyd's Bank, Harry Paris, to discuss the loan. Paris was unable to approve the loan because it was above his limit. He told defendant he would submit the proposal to the bank's regional office in Fresno. He also asked for information regarding the legality of the loan.

Defendant also contacted Andrew Tolli, a friend of defendant's and chairman of the board of CET, and told him he needed a recommendation so he could get a line of credit with Lloyd's Bank. Tolli agreed he would help as long as it did not involve trust money. Defendant then delivered two letters to Tolli. In the first he explained he needed the money because he had "helped some people and they are now seeking to renege." He claimed trust certificates would not be disturbed at all. However, the second letter was one to Paris prepared for Tolli's signature. It pledged certificates of deposit to defendant as an accommodation in securing a loan or line of credit, and falsely claimed defendant had discussed the matter with the corporate commissioner's office and no objection to the transaction existed. Although confused by the letters, Tolli signed the one to Paris.

Defendant gave the letter to Paris who sent it to his supervisor, Cole, in Fresno, along with a credit report stating the loan was to be $300,000 and for the purpose of financing defendant's law practice. It was to be repaid in six months. However Cole refused to approve the loan saying it was in violation of the trust agreement. Paris relayed this information to defendant. Defendant submitted a letter saying the transaction was legal and had been sanctioned by the corporations commissioner. Cole still refused to approve the loan. He said if defendant wanted the money CET would have to borrow it and then lend it to him. However this required Tolli to sign the appropriate documents.

Defendant then telephoned Tolli and told him the trust needed $250,000 and that he would send the necessary papers for him to sign. He did so and Tolli signed them. The loan to CET was then approved. However, at trial when these papers were introduced a notation on them indicated defendant's personal account was to be credited. Tolli claimed this notation was not on the papers he signed.

Defendant later obtained another $100,000 in much the same way. He testified he used the money to pay off the settlement judgment and for other "personal and corporate matters."

Subsequently the company that managed CET's books became aware of the loan and they notified CET's independent auditor. Tolli was also

notified about the loan and was stunned. In the meantime the loans became due. Defendant again had to borrow money in order to pay off these debts. This constitutes the "Janmohamed transaction."

Through one of defendant's clients, John Banks, defendant learned of some possible investment property in Fairfield known as the Waterman Ranch. Defendant met with some investors to discuss purchasing the property. The group agreed defendant would act as their attorney and defendant's codefendant Reinaldo as their real estate broker. A bank account under the name "Waterman Investment Group" was opened with defendant as sole signatory.

One of the investors was a Dr. Janmohamed, who arranged for a letter of guaranty for $250,000 to be sent from a bank in England. Since he was leaving on a trip he gave Reinaldo a limited power of attorney with instructions that if the property was to be purchased his family in East Africa could be contacted and arrange to have the money sent. Although the property was eventually sold to another party Reinaldo arranged to have the money sent to the United States.

Reinaldo then contacted Banks and told him defendant needed to borrow $350,000 for a short period of time. Banks agreed to loan him $200,000. Defendant approached another investor in the Waterman Group, McIntosh, and arranged for a $50,000 loan. He told him he needed the money for a property venture in Reno. He then got another $100,000 from Lloyd's Bank secured by a certificate of deposit from proceeds from the sale of a building he owned. With this $350,000 he paid off the CET loans.

However, soon thereafter defendant again ran into trouble when Banks began pressuring him to repay the $200,000. While this was going on Reinaldo was trying to track the money sent from Dr. Janmohamed, which had become lost in the banking system. The check, payable to Title Insurance and Trust Company, was eventually found. Defendant had it endorsed to the Waterman Investment Group Account at Lloyd's Bank. He then made out a check from the investment account to his professional account for $225,000. He used this money to repay Banks. Dr. Janmohamed later found out about this when he returned from his trip. Defendant was unable to pay him back. However, at this point defendant was indicted by the grand jury.

## II. ANALYSIS

A. *Failure to File Information Pursuant to Penal Code Section 1382, Subdivision 1*

On December 4, 1980, the grand jury indicted defendant on three counts of embezzlement (Pen. Code, § 532), two counts of false pretenses (Pen.

Code, § 502) and one count of conspiracy (Pen. Code, § 182.) Defendant requested a postindictment preliminary hearing and the parties agreed that the indictment would be treated as a "complaint" for this purpose. A number of motions followed and then on July 1, 1982 the prosecution filed a motion to file a first amended information. At this point the question arose as to what this information would be amending. Apparently no formal information had ever been filed.

Defendant immediately filed a motion to dismiss claiming the failure to file an information within 15 days of the holding order violated Penal Code section 1382, subdivision 1. A hearing was held and the judge denied the motion. Although he doubted that the prosecution had shown good cause for the delay, he found defendant had waived his right to have the charges dropped.

■ On appeal defendant argues he did not waive his right to have an information filed within 15 days and such an important right, associated with his right to a speedy trial, cannot be waived. ■ Furthermore he claims the amended information was filed after the statute of limitations had run on the offenses. ■ We agree with defendant that once he requested a postindictment hearing, the better procedure would have been for the prosecutor to immediately file an information following the holding order. (See *Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584, 594 [150 Cal.Rptr 435, 586 P.2d 916]; *Martinez* v. *Superior Court* (1980) 106 Cal.App.3d 975, 978 [165 Cal.Rptr. 267]; *People* v. *Municipal Court* (*Kong*) (1981) 122 Cal.App.3d 176, 187 [175 Cal.Rptr. 861]; Cal. Rules of Court, rule 227.3(a)(1).) Nevertheless, we find defendant's arguments are meritless.

■ We begin by addressing briefly defendant's statute of limitations argument. His claim is as follows: The offenses in question occurred between June 1978 and March 1979. Although the indictment was filed on December 4, 1980, the amended information, which alleged new charges, was not filed until July, 1982. By that time the then three-year statute on the alleged crimes had run. Thus, under the authority of *People* v. *Chapman* (1975) 47 Cal.App.3d 597 [121 Cal.Rptr. 315], the judgment must be reversed.

Defendant's argument must be rejected. The indictment charged him with the crimes of embezzlement and false pretenses. The amended information charged him with grand theft. The crime of grand theft includes that of embezzlement and false pretenses. (*People* v. *Britz* (1971) 17 Cal.App.3d 743, 751 [95 Cal.Rptr. 303]; Pen. Code, § 487, subd. 1.) Thus no new offense was charged.

Furthermore *People* v. *Chapman, supra,* 47 Cal.App.3d 597 is distinguishable. There the information was amended to include not only the original charge of rape but that of rape with a victim under 18 years old. The amendment was filed more than three years after the rape had allegedly occurred. The court found the prosecutor should not have been allowed to amend the information because rape with a person under the age of 18 is not a lesser included offense of rape *and* furthermore the original information did not include the fact that the victim was under 18. (*Id.,* at pp. 603-604.) Such is not the case here. The facts which formed the basis for the amended information can all be traced back to the original indictment, and as mentioned previously, no new offense was alleged. Thus defendant's statute of limitations argument must be rejected.

■ We turn next to the question of waiver. Penal Code section 1382, subdivision 1 states, "The court, unless good cause to the contrary is shown, must order the action to be dismissed in the following cases:

1. When a person has been held to answer for a public offense and an information is not filed against him within 15 days thereafter." Few cases have dealt with violations of this section. In *People* v. *Farrington* (1903) 140 Cal. 656 [74 P. 288] and *People* v. *Ludviksen* (1970) 8 Cal.App.3d 996 [87 Cal.Rptr. 781], the court found the prosecution had shown good cause for the delay. Thus these cases are clearly distinguishable.

However both *People* v. *Murray, infra,* and *Ciaccio* v. *Superior Court, infra,* dealt with the question of waiver. In *People* v. *Murray* (1967) 247 Cal.App.2d 730 [56 Cal.Rptr. 21], the prosecution filed the information on the sixteenth day. The court found defendant had waived his speedy trial right because his counsel had requested this date for filing and defendant had personally agreed to it. (*Id.,* at pp. 732-733.) However in *Ciaccio* v. *Superior Court* (1984) 156 Cal.App.3d 130 [202 Cal.Rptr. 674], the court failed to find a waiver when the facts showed defendant simply failed to object to a late arraignment date.

The facts in this case are much different than in the above cases. However they do indicate that under certain circumstances a waiver of these rights can occur. ■ As was stated in *People* v. *Wilson* (1963) 60 Cal.2d 139 [32 Cal.Rptr. 44, 383 P.2d 452], "[I]n considering the legal consequences of a denial of a speedy trial it should be kept in mind that we are dealing not with a favored right such as the right 'to appear and defend, in person and with counsel' [citations] but with a privilege personal to the defendant which will be *deemed to be waived if not asserted by him in a timely fashion.*" (*Id.,* at p. 148.)

▮ We find the facts here support such a finding of waiver. Not only did defendant wait 14 months to bring the motion, but it was not brought until the first day of trial. Other facts also support this finding. For example, defendant was *held to answer* to the *indictment*. At his arraignment, which counsel knew had to be scheduled within 15 days of the holding order, defendant *pled not guilty* to the charges in the *indictment*. Over the next 14 months a number of motions were filed based upon the indictment being used as an accusatory pleading. Defendant even brought two motions directly addressed to the indictment, a motion to have it set aside on the basis of insufficient evidence, and a motion striking certain words from count VI of the indictment as surplusage. When defendant sought review in the Court of Appeal and California Supreme Court from the denial of his motion for a change of venue (see *infra*) he referred to being charged in a six-count *indictment*. We find that the above facts coupled with the lengthy delay in bringing the motion to dismiss constituted a waiver of defendant's right to have the information filed within 15 days.

▮ Furthermore, on appeal a defendant must show he was prejudiced by the denial of his motion. (*People* v. *Wilson, supra,* 60 Cal.2d at 152.) ▮ Again, the above facts indicate defendant suffered no prejudice. However he claims that if the motion to dismiss had not been erroneously denied in the trial court, the charges against him could not have been refiled because the statute of limitations on them had run. This argument has already been made and rejected.

Lastly, the failure to file the information did not prevent defendant from knowing the charges with which he would be confronted at trial. Defendant was originally indicted on charges of false pretenses and embezzlement. The amended information charged grand theft, which is just the broader classification of these crimes. (See Pen. Code, § 490a; *People* v. *Selk* (1941) 46 Cal.App.2d 140, 146 [115 P.2d 607].) Therefore, we find defendant's speedy trial rights were not violated.

B. *Sufficiency of the Evidence at the Preliminary Hearing.* *

. . . . . . . . . . . . . . . . . . .

C. *Denial of Motion for Change of Venue.*

▮ Prior to trial defendant, pursuant to Penal Code section 1033, made a motion for change of venue fearing he would not receive a fair and

---

* See footnote, *ante,* page 1333.

impartial trial in Sacramento County. He attempted to show he was a prominent and well-known figure in the community. In fact he had been vice mayor of Sacramento and at the time of the indictment had been nominated to sit on the Third District Court of Appeal. Attached to defendant's motion were numerous articles dealing with his indictment and the State Bar proceedings to revoke his license. He claims the publicity was never ending for the three years preceding trial and that "[o]ne is almost tempted to observe that sooner as a nation we will forget Watergate than will the people of Sacramento forget about *Milton L. McGhee.*"

The trial judge denied defendant's motion. As he explained, "The offense alleged is not of a heinous nature or revolting to the sensibilities of the community, and the punishment involved in the event of a conviction while not minimal, is not of the same gravity as would occur following a conviction for a capital offense. The media coverage of the charges has not been inflammatory or sensational. Sacramento County has a large population from which the defendant can draw an unbiased jury. The fact that Mr. McGhee is a respected member of the community shall be to his benefit and not to his detriment. Finally the delay between the news coverage and the trial is significant . . . Of course, if the trial judge finds during voir dire that publicity has prejudicially affected the veniremen, he may abort the proceedings." We agree with the judge's conclusion, particularly in light of what the voir dire established.

■ However we begin by noting that "[i]n a proceeding of this nature an 'appellate court may not limit itself to an "abuse of discretion" review; rather, it makes an independent review of the evidence and reaches a de novo decision.' " (*Steffen* v. *Municipal Court* (1978) 80 Cal.App.3d 623, 625 [145 Cal.Rptr. 782]; *Martinez* v. *Superior Court* (1981) 29 Cal.3d 574, 577 [174 Cal.Rptr 701, 629 P.2d 502].) In doing so five controlling factors are examined: "the gravity and nature of the crime, the extent and nature of the publicity, the size and nature of the community, the status of the victim, and the status of the accused." (*People* v. *Balderas* (1985) 41 Cal.3d 144, 177 [222 Cal.Rptr. 184, 711 P.2d 480].) Furthermore "[o]n postconviction review, we must also examine the voir dire of prospective and actual jurors to determine whether pretrial publicity did in fact have a prejudicial effect." (*Ibid.*)

■ The first factor to be examined, the gravity and nature of the crime, does not weigh in defendant's favor. ■ "Gravity" refers to a crime's "seriousness in the law and to the possible consequences to an accused in the event of a guilty verdict." (*Martinez* v. *Superior Court, supra,* 29 Cal.3d at p. 582.) ■ Although embezzlement and false pretenses are serious crimes, they are clearly not as serious as rape or murder, and thus the

punishment for such crimes is not as grave. ■ As for the "nature" of the crime, this refers to "[t]he peculiar facts or aspects of a crime which make it sensational, or otherwise bring it to the consciousness of the community." (*Ibid.*) ■ Again theft crimes appear to be less sensationalized than violent crimes. (*Id.,* at p. 583.)

With regards to the nature and extent of the publicity of defendant's crime, we note that the story was certainly newsworthy. However "the reports were uniformly straightforward and factual. They were not 'continuous and extensive' [citation] nor exceptionally long or prominent, and they did not dwell on any sensational or hostility-provoking elements of the case." (*People* v. *Balderas, supra,* 41 Cal.3d at 178.) *Steffen* v. *Municipal Court, supra,* 80 Cal.App.3d 623, cited by defendant, is distinguishable. There the defendants had been charged with soliciting acts of prostitution. The court found that the defendants' place of employment, the Easy Street Theater, had received extensive publicity as a place where prostitution was regularly solicited. This weighed heavily in the court's decision to grant their request for a change of venue. The sensationalism of these facts combined with the type of publicity received distinguishes it from this case.

Nor was the size and nature of the community a problem. In 1981 Sacramento County was the 7th largest county in the state with a population of 806,100. In *Balderas* the California Supreme Court found the defendant could receive a fair trial in Kern County, which had a population of 405,600, roughly half that of Sacramento.

The status of the victim also weighs against defendant's motion for change of venue, since the victims were a bank and a corporation. However, we do note that others who testified in the trial were prominent figures, including some judges. Also defendant was a well-known figure. Yet, even so, this does not suggest a change of venue was required. The status of the victim and the accused are important factors to be considered, but they are not controlling. (*Martinez* v. *Superior Court, supra,* 29 Cal.3d at 584.) In fact as the trial judge pointed out, his prominence in the community could even weigh in his favor.

Finally we note that after the voir dire of the jury defendant did not renew his motion. (See *People* v. *Hoover* (1986) 187 Cal.App.3d 1074, 1085 [231 Cal.Rptr. 203] [failure to renew motion can constitute waiver of argument on appeal].) In fact it appears a number of the panel members had not even heard about the alleged crime. Of 83 prospective jurors 51 had not been exposed to pretrial publicity. Only 9 felt they were influenced by the publicity. Of the 12 selected only 3 had been exposed to pretrial publicity or had any recollection of the case. We cannot conclude defendant was denied

a fair trial on this basis. (Cf. *People* v. *Balderas, supra,* 41 Cal.3d 144.) ■ " 'It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion of the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' " (*People* v. *Harris, supra,* 28 Cal.3d at 949-950, quoting *Irvin* v. *Dowd* (1961) 366 U.S. 717, 722-723 [6 L.Ed.2d 751, 755-756, 81 S.Ct. 1639].)

D., E.*

. . . . . . . . . . . . . . . . . . . . . .

### F. *Testimony by Judges Morgan and Eissinger.*

■ At trial, Judges Morgan and Eissinger testified as to the bad character of defendant's primary witness, James Moore. The record is unclear as to whether these witnesses were subpoenaed or testified voluntarily. Defendant argues: (1) their testimony was in violation of canon 2 of the Code of Judicial Conduct, and (2) he was erroneously precluded from presenting surrebuttal evidence as to the judges' motivation for testifying. Because no objection was made at trial to the judges' testifying, we need not address this argument. However, we comment briefly on the point.

■ Canon 2 provides, "A judge should avoid impropriety and the appearance of impropriety in all his activities." The commentary to canon 2 goes on to say, "The testimony of a judge as a character witness injects the prestige of his office into the proceedings and may be misunderstood to be an official testimony." However, while case law has developed dealing with the testimony of judges or prosecutors in cases *on which they worked* (*People* v. *Guerrero* (1975) 47 Cal.App.3d 441 [120 Cal.Rptr. 732]; *Merritt* v. *Reserve Ins. Co.* (1973) 34 Cal.App.3d 858; Evid. Code, §§ 703, 703.5 [110 Cal.Rptr. 511]), we find none restricting them from testifying as character witnesses in other cases. (See 2 Witkin, Cal. Evidence (3d ed. 1986) Witnesses, § 1058, pp. 1004-1005.) Yet our code is modeled after the American

* See footnote, *ante,* page 1333.

Bar Association Code and when this code was being discussed many were concerned with this problem. They concluded it was best that judges *not* be *voluntary* character witnesses. (See Thode, Reporter's Notes to Code Jud. Conduct (1973) at p. 49.) We suggest that if a judge's testimony is necessary to a case the proper procedure to follow would be to subpoena him.

 As for the preclusion of surrebuttal testimony, defendant wished to introduce evidence of a transaction in which Judge Morgan had allegedly been "screwed" by James Moore in an arbitration hearing. He wished to present similar testimony against Judge Eissinger. The judge refused to allow in this evidence. We find the trial judge did not abuse his discretion in so ruling. The evidence would likely have taken a good deal of time to present and would have resulted in the issue being confused for the jury. (Evid. Code, § 352.)

G.–I.*

. . . . . . . . . . . . . . . . . . . . .

J. *Denial of Wheeler Motion.*

After the jury panel had been sworn in, and the attorneys were choosing alternates, defendant moved for a mistrial pursuant to *People* v. *Wheeler* (1978) 22 Cal.3d 258. At that point the prosecutor had exercised 12 peremptory challenges as to the sitting jurors. Of those challenged three were Black, and one had a Spanish surname. As for the alternates, one Black person and one with a Spanish surname had been challenged.

The court initially ruled that the motion was too late as to the sitting jury because *Wheeler* required that the motion be made in a "timely fashion" and the jury had already been sworn in. But he agreed to entertain the motion as it pertained to the selection of the alternates. He further found that as for the alternates no inference of group bias had been shown regarding Ms. Gonzales. But he did ask the prosecutor to explain why Mr. Pace had been excluded. The prosecutor, however, wisely offered to give reasons for all of the excused Black jurors. Therefore, we need not initially decide whether the trial judge was correct in finding the motion was in part untimely.

 Defendant argues the prosecutor's reasons are inadequate. In particular he claims the prosecutor improperly excluded Black jurors because

*See footnote, *ante,* page 1333.

they had no knowledge of time certificates of deposit (TCD's). He claims the average Black or Hispanic would have no knowledge of TCD's and thus excusing jurors on this basis is impermissible. Furthermore, he argues the record shows the prosecutor's questioning on this subject was superficial.

 Additionally, defendant claims excusing several jurors because of their youth and inexperience was impermissible. Finally, he argues the court should have considered why the prosecutor challenged the two Hispanic jurors.

 In *People v. Wheeler, supra,* 22 Cal.3d 258, the California Supreme Court held that the use of peremptory challenges to remove prospective jurors on the sole ground of group bias violated the accused's right to a jury trial under the California Constitution. The *Wheeler* court went on to explain that if a defendant felt jurors were being impermissibly challenged he must first "raise the point in a timely fashion and make a prima facie case of such discrimination to the satisfaction of the court." (*Id.,* at p. 280.) The burden then shifts to the prosecution to "'show if he can that the peremptory challenges in question were not predicated on group bias alone' . . . the showing . . . must persuade the court that the peremptory challenges in question were exercised 'on grounds that were reasonably relevant to the particular case on trial or its parties or witnesses—i.e., for reasons of specific bias as defined herein.'" (*People v. Turner* (1986) 42 Cal.3d 711, 720 [230 Cal.Rptr. 656, 726 P.2d 102].) The Supreme Court has recently adopted a similar procedure. (*Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712].)

We begin by noting that the judge did not explicitly state defendant had made out a prima facie case. However, he did ask the prosecutor for his reason for excluding one of the alternates, finding the other juror had been excluded on grounds of specific bias. Therefore we assume a prima facie case was established. (*People v. Turner, supra,* 42 Cal.3d at p. 719; *People v. Davis* (1987) 189 Cal.App.3d 1177, 1191-1192 [234 Cal.Rptr. 859].) We now turn to an examination of those reasons:

1. *Mildred Alexander*: "[I]t is pretty clear from the record that there exists a good reason for me to peremptorily challenge her on the grounds that she had made love to one of the defendants, Mr. Reinaldo, on, let's say, six to eight occasions. She wasn't sure. [¶] She felt he as a gentleman, and she stated she had no reason to think he was other than trustworthy."

2. *Charlene Hamilton*: "Mrs. Hamilton's mother was represented by Mr. McGhee in a divorce action, the result of which appeared favorably as far as Mrs. Hamilton was concerned. [¶] Additionally, Mrs. Hamilton came

in here on three successive days and sat directly behind Mr. McGhee on each of those occasions. [¶] She seemed, in appearance, friendly towards him and given the prior contact she had with him, I felt that she should be challenged, which challenge I made."

3. *Gary Deal*: "Mr. Deal, on July 21st, came into the courtroom with an untucked football jersey on, Levi's and tennis shoes. [¶] The next day he came in with a v-neck t-shirt and a sweat shirt and Levi's, and on July 30th, he came in with just a T-shirt. [¶] Given that alone, I feel that he simply was too hang loose to be a juror in a case of this complexity, and that he simply didn't approach this with a seriousness, which I felt a juror must and should. [¶] Additionally, I felt that he was inexperienced in terms of the slice of life that he has go through and he's also, according to the jury book, not registered to vote, which indicates to me, again, a lack of seriousness about his civic duties. [¶] Given those reasons and those are: When asked whether or not he would or could, without any trouble, come back into the courtroom, confront defendant McGhee with a guilty verdict, he had a substantial hesitation with regard to that. [¶] When asked about the not guilty verdict, there was no hesitation. [¶] That caused me concern. [¶] And, additionally, he didn't understand, didn't know what a T.C.D. was and just did not seem to have the makeup to do the deliberations required in this type of a case, that is, of comparing and contrasting all the documentary evidence with that of the other jurors.

4. *Michael Pace*: "The jury book indicates that Mr. Pace has an incredibly bad driving record. [¶] He has five failures to appear on his record. [¶] He has numerous speeding tickets, and with regard to the FTA's, it seems to me that that reflects a lack of responsibility, not only relative to one's personal welfare but to a civic duty to take care of such matters in a efficient manner and get them out of the way. [¶] During the course of those contacts, he could well —and I asked him if he ever had any unfortunate experience with law enforcement. It seems to me that with that many tickets, there is something that happened or at least he might have mentioned that while he did have that type of contact with law enforcement, there was nothing that occurred that might affect his ability to be fair and impartial, but he never mentioned it. That caused me some concern. [¶] Additionally, he didn't know what a T.C.D. was. [¶] He didn't understand the concept of collateralization of loans, and he didn't balance his check book. And given the type of case this is, that causes me concern in terms of his ability to deliberate on the type of evidence which he would have had to deliberate on had he sat. [¶] Also, as with Mr. Deal, he seemed simply inexperienced in terms of the amount of life he's seen, and I have excused other jurors who were similarly situated with respect to that aspect."

In reviewing these reasons, as pointed out in *People* v. *Chambie* (1987) 189 Cal.App.3d 149 [234 Cal.Rptr. 308], we must keep in mind certain principles set forth in *Wheeler* and *Turner*: "(1) the prosecutor need not make a showing that rises to the level of a challenge for cause . . . and (2) the trial court must make a sincere and reasoned attempt to evaluate the prosecutor's explanation and decide whether it is genuine, based upon the court's familiarity with the circumstances of the case, its knowledge of trial tactics and its observations of the manner in which the prosecutor has examined members of the jury venire and has exercised challenges for cause and peremptory challenges. [Citations.]" (*Id.,* at p. 154.) ▆▆▆ Finally, deference must be given to the trial judge's discretion. (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 282.)

After the prosecutor presented the above cited reasons the judge allowed defense counsel time to respond. He then discussed the reasons himself, finding they were adequate. He stated that although he "would place little stock in whether or not a prospective juror is familiar with T.C.D.'s" that the prosecutor had "consistently, from the very outset of this trial, long before any issue of discrimination arose, questioned prospective jurors and almost all of them and including, certainly non-black prospective jurors, on this subject." He then denied the motion. We agree with the trial judge's conclusion.

We note first the prosecutor was not simply excluding jurors because they had no knowledge of TCD's. Other reasons existed as well, which the trial judge found to be valid. For example, he felt some of the jurors did not seem particularly responsible. Others directly or indirectly knew the defendant or his codefendant.

Nor do we find valid defendant's argument, based on *People* v. *White* (1954) 43 Cal.2d 740 [278 P.2d 9], that it is improper to question jurors on their knowledge of TCD's because it discriminates against minorities and lower class people. *White* is distinguishable because it dealt with the counties selection of jury panels. Although language in that case suggests the working class should not be excluded from serving this does not suggest that in a case regarding a somewhat complicated financial transaction a juror cannot be questioned on his or her knowledge of the subject. Furthermore as the People point out in their brief, the prosecutor did not necessarily select just jurors with knowledge of TCD's, but those who knew something about finances, i.e. had accounting experience or experience as a cost analyst. Finally, the questions were relevant because they related to the underlying trial. (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 282.)

We also find no merit in defendant's argument that young people were improperly excluded. Youth is not recognized as a cognizable class for

purposes of a *Wheeler* motion. (*People* v. *Marbley* (1986) 181 Cal.App.3d 45, 48 [225 Cal.Rptr. 918].)

■ The day after the hearing on the *Wheeler* motion the prosecutor informed defense counsel that he planned to challenge the only Black that was presently on the jury. He explained that "given Mrs. Lôve's answers relevant to her being able to follow the reasonable doubt versus all possible doubt standard and given her reservation, that is—I don't know if she is, by nature, a timid person or reserved person or what. That her demeanor caused me great concern. [¶] And while I asked her twice, upon reflection, I arrived at the conclusion that I was very uncomfortable with her on the jury . . ."

Defense counsel again moved for a mistrial and the judge denied the motion, this time without comment. Here again we find the prosecutor's reasons adequate under *Wheeler*. As explained in that case the looks and gestures of a potential juror may lead one to believe he or she should be excused. (22 Cal.3d at p. 275.) Furthermore she expressed doubt on her ability to follow the law. We therefore agree with the trial court's conclusion that Blacks were not being removed from the jury panel based on group bias.

■ We next address whether the judge should have asked for reasons for excluding Jurors Vasquez and Gonzales. Since Juror Vasquez was on the sworn jury the judge simply considered Gonzales and as to her found a prima facie case had not been made. The prosecutor did not offer any reason for excluding Mr. Vasquez, although in discussing why he dismissed Mr. Pace he mentioned Mr. Vasquez in passing when he stated "he [Mr. Pace] seemed simply inexperienced in terms of the amount of life he's seen, and I have excused other jurors who were similarly situated with regard to that aspect. [¶] I have excused Mr. Crisderman, Mr. Vasquez, and Mr. Regan Wong for those reasons."

We find no prima facie case was established as to Mr. Vasquez and thus the prosecutor was not required to give his reasons for excusing him. ■ Under *Wheeler* the defendant must initially make out a prima facie case of discrimination. "First . . . he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule. Third, from all the circumstances of the case he must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias." (*Wheeler*, 22 Cal.3d at p. 280.) It is useful to call to the

court's attention whether the defendant and/or victim is a member of the excluded group. (*Id.,* at p. 281.)

 Defense counsel did not make clear that the *Wheeler* motion was aimed at Hispanics as well as Blacks, and he had the duty to make the record clear. Although he mentioned the two jurors with Spanish surnames when he originally made the motion, the next day at the hearing he only argued concerning "the District Attorney's systematic exclusion of blacks from the jury." In fact argument centered only around the exclusion of Black jurors.

We realize that the court felt the motion was untimely as to Mr. Vasquez because he was on the sworn jury. However, the prosecutor agreed to give reasons for those excused from the sitting jury. Defense counsel even had a chance to respond to these reasons yet at no point did he again raise the issue of whether Mr. Vasquez made out a separate cognizable group for purposes of a *Wheeler* motion. Furthermore defendant cites no authority for the proposition that Blacks and Hispanics make up one cognizable group for purposes of the motion. Lastly neither of the defendants was Hispanic, though we realize this is not a necessary criterion for challenging the exclusion of that group. (*Id.,* at p. 281.) Because a prima facie case was not established, we find no error in the prosecutor's failure to give reasons for excluding Mr. Vasquez.

The judgment is affirmed.

Anderson, P. J., and Channell, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 25, 1987. Broussard, J., did not participate therein.