Filed 3/30/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re BRIAN KERINS<br><br>    on Habeas Corpus. | A165304<br><br>(San Francisco City & County<br>Super. Ct. Nos. 1704798, 167206) |

In July 2006, the People filed a petition to commit Brian Kerins as a Sexually Violent Predator (SVP). More than 14 years later, Kerins unsuccessfully petitioned for a writ of habeas corpus in the trial court claiming the People had failed to bring him to trial in a timely manner. Kerins now seeks habeas relief in this court based on unconstitutional pretrial delay. Despite the extraordinary length of the delay, we conclude the trial court acted within its discretion in determining Kerins's speedy trial rights were not violated. We also reject Kerins's other arguments relating to the lawfulness of a custody hold before the People filed the SVP petition and the effectiveness of his trial counsel. We will deny Kerins's writ petition.

## I. BACKGROUND

***July 2006: Petition To Commit Kerins as an SVP***

In 1988, Kerins was convicted of sodomy with a person under 18, an SVP qualifying offense. In 1998, Kerins pleaded guilty to two counts of annoying or molesting a child under 18. The trial court sentenced him to 13 years in prison.

1

Kerins's scheduled release date was July 25, 2006. Prior to the scheduled release date, two psychologists concluded Kerins met the criteria for an SVP under Welfare and Institutions Code[1] section 6600, subdivision (a). The Department of Mental Health requested that the San Francisco District Attorney file a petition to commit Kerins as an SVP.

At some point between July 19, 2006 and July 27, 2006, the district attorney filed a petition to commit Kerins as an SVP. The trial court appointed Mark Nicco as Kerins's counsel. Nicco was relieved on August 14, 2006, and replaced by Harold Rosenthal, whom Kerins retained as counsel.

### *August 2006 – April 2011: Representation by Harold Rosenthal*

The trial court scheduled the probable cause hearing for October 27, 2006, then rescheduled it for October 20, 2006. Rosenthal informed the court that he intended to file a motion to dismiss at the probable cause hearing.

The trial court continued the probable cause hearing at least nine times over the next six months. Rosenthal requested one of the continuances due to holiday travel and a family emergency. The court granted one of the continuances because a doctor scheduled to testify did not receive a subpoena, while other doctors were unable to appear. The reasons for the remaining continuances are not indicated in the record.

The probable cause hearing commenced on May 10, 2007 and concluded on May 25, 2007, with the trial court finding probable cause to commit Kerins as an SVP. The People filed an amended petition to commit Kerins as an SVP on May 25, 2007. At a hearing on June 13, 2007, the trial court set the SVP trial for October 1, 2007.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

The trial court did not hold a trial on October 1, 2007. The record does not indicate the reason. On November 30, 2007, the trial court issued an order transferring Kerins to a state hospital for treatment.

Between March 7, 2008 and May 26, 2010, the trial court continued the trial date approximately 20 times. The record does not indicate the trial court's reasons for granting about half of these continuances. The People requested one of the continuances because the deputy district attorney assigned to the case left the district attorney's office. Rosenthal did not object the People's request. The trial court granted the remaining continuances at Rosenthal's request. Rosenthal requested some of the continuances for reasons intended to benefit Kerins, such as providing additional time for Kerins to receive treatment at the state hospital, and providing additional time for doctors to perform a follow-up examination of Kerins. Rosenthal requested other continuances due to scheduling conflicts he had with other cases.

On June 9, 2010, Rosenthal informed the trial court he wanted to consider whether to file a motion for a new probable cause hearing in light of *In re Ronje* (2009) 179 Cal.App.4th 509, which held that assessment protocols used to evaluate SVP's were based on an invalid regulation, and that an SVP defendant is not required to show prejudice from the use of the invalid assessment protocols. (*Id*. at p. 513.) The court continued the matter to June 30, 2010. The court continued the matter again to July 12, 2010, and then to July 19, 2010, because Rosenthal did not appear at the scheduled hearings. On July 19, 2010, the trial court scheduled a new probable cause hearing for October 4, 2010.

On October 4, 2010, Rosenthal did not appear in court. Through the deputy district attorney, Rosenthal communicated to the trial court that he

3

would not be filing a motion based on *Ronje* "at this time." The court continued the matter to October 6, 2010, to schedule a new trial date.

The trial court continued the case eight times between October 6, 2010 and November 24, 2010, either because Rosenthal requested a continuance or did not appear at the scheduled hearing. At the November 24, 2010 hearing, the court told the deputy district attorney with regard to Rosenthal: "Call him back and tell him . . . that the court is thinking about an order to show cause. We have put this over several times, more than I can count on my hand."

Rosenthal was present at the November 29, 2010 hearing, where the court scheduled a probable cause hearing for January 31, 2011, presumably in light of *Ronje*. At the end of the hearing, the court asked Rosenthal, "[W]here's the defendant?" and "[D]o you plan to have him testify at some point?" Rosenthal responded, "No, I prefer that he not be brought here."

On January 31, 2011, the trial court granted Rosenthal's request to continue the probable cause hearing because "the doctors who will be key to this matter are not available." The hearing was continued to March 28, 2011. On March 28, 2011, the People requested a continuance to procure updated evaluations because their prior evaluations were over a year old. Rosenthal did not object to a continuance but did object to having the same doctors as before conduct the evaluations. The court granted the continuance and set the probable cause hearing for May 25, 2011.

### May 2011 – November 2016: Representation by David Simerly

On April 25, 2011, the trial court held a hearing on a motion to appoint counsel for Kerins. Rosenthal was not present, but he apparently made a request to withdraw from representation. The court continued the matter to April 27, 2011, and then to May 4, 2011.

4

On May 4, 2011, the trial court appointed David Simerly to represent Kerins. The court scheduled a hearing on June 20, 2011, to set the probable cause hearing.

Simerly requested and was granted a continuance on June 20, 2011, to review three boxes of discovery provided by Rosenthal. Simerly requested and was granted another continuance on September 14, 2011, because "we just got funding for the defense expert." The trial court then granted Simerly's continuance requests on October 19, 2011, December 14, 2011, February 1, 2012, March 28, 2012, and May 30, 2012, in order accommodate the defense expert's schedule for meeting with Kerins and preparing a report.

On July 18, 2012, Simerly informed the trial court that the deputy district attorney was requesting a continuance due to a family emergency. The court continued the matter to September 12, 2012.

On September 12, 2012, Simerly informed the trial court that the defense evaluation was complete but that there were additional evaluations being conducted by the People. The court continued the matter to October 31, 2012, and then to January 9, 2013.

On January 9, 2013, Simerly told the trial court, "I have been advised that we do have no evaluation available [*sic*]." The court granted Simerly's request for a continuance to February 13, 2013. On February 13, 2013, Simerly requested another continuance based on his understanding that he would be receiving additional discovery. The court continued the matter to April 3, 2013.

On April 3, 2013, Simerly informed the trial court that he visited Kerins at the state hospital. Kerins requested that Simerly "explore a couple of motion options." The court set a hearing for May 29, 2013, for setting of the potential motions. At the May 29, 2013, hearing, Simerly requested a

continuance because he was waiting for transcripts, which the deputy district attorney said she could have within a week. Simerly also said he would be in trial in another case all of June. The court continued the matter to July 31, 2013. For reasons not indicated in the record, the court continued the matter again to October 2, 2013, then to November 20, 2013, and then to January 22, 2014.

On January 22, 2014, on Simerly's request, the trial court continued the matter to April 14, 2014, for setting of Simerly's motions and the SVP trial. There was no longer a need for a new probable cause hearing in light of the California Supreme Court's decision in *Reilly v. Superior Court* (2013) 57 Cal.4th 641, where the Court overruled *In re Ronje, supra*, 179 Cal.App.4th 509, and held that any issues from the faulty assessment protocols must result in a material error before a new probable cause hearing is required. (*Reilly*, at p. 646.)

On April 14, 2014, Simerly requested a continuance because "I think there are new evaluations on the way." The trial court continued the matter to June 18, 2014.

On June 18, 2014, August 27, 2014, November 3, 2014, and January 21, 2015, the trial court granted Simerly's continuance requests as Simerly was waiting for records to be provided by the Board of Parole Hearings (parole board). The records were received by the trial court on March 30, 2015, and the court continued the matter to June 15, 2015.

On June 15, 2015, Simerly told the trial court he was in the process of preparing a motion to dismiss and that a rough draft was sent to Kerins for his review. The court set a hearing on the motion for August 17, 2015. On August 17, 2015, Simerly informed the court that he filed the motion but that he "knew [the deputy district attorney] was going to need additional time to

6

respond" in order to obtain additional prison records. The grounds for dismissal argued in the motion are not apparent in the record. The court continued the matter to October 5, 2015.

On October 5, 2015, Simerly informed the trial court that he and the deputy district attorney "have been talking about other resolution options, and we are probably going to want to calendar a petition for conditional release and with the motion going over to that same date." The deputy district attorney said he also wanted to file a supplemental response to Kerins's motion. The matter was continued to December 14, 2015, to hear the motion to dismiss and set a trial date. On December 14, 2015, Simerly made an oral request for a continuance for unknown reasons. The matter was continued to January 4, 2016.

On January 4, 2016, the deputy district attorney informed the trial court that Simerly "had a serious accident and has undergone surgery and so he's very debilitated." The court continued the matter to February 8, 2016. On February 8, 2016, Simerly appeared and told the court, "I thought I was going to be in much better shape today, and I'm not." He and the deputy district attorney discussed continuing the case and also case resolution options. The court continued the matter to March 14, 2016.

On March 14, 2016, the trial court said that Simerly planned to file a petition under section 6608 for Kerins's conditional release. The court said it would order the state hospital to prepare an evaluation. The court continued the case to May 9, 2016, to address this matter, as well as the outstanding motion to dismiss and setting of a trial date. The next day, March 15, 2016, Simerly filed a petition for Kerins's conditional release under section 6608.

On May 9, 2016, Simerly informed the trial court that "the consensus" was that the parties wanted a request for updated evaluations of Kerins

under section 6601, which governs evaluations to determine if someone qualifies as an SVP, but that this was a "special request" so that the evaluators could take into account Kerins's amenability to outpatient treatment. The matter was continued to June 27, 2016. From June 27, 2016 until September 12, 2016, the court continued the matter five times as the parties waited for the evaluations to be prepared and delivered to the court.

On September 26, 2016, the deputy district attorney informed the trial court that "the wrong report had been requested. It needs to be a [section 6608] report," which relates to conditional release, and "hopefully the report will now come." Simerly said he presumed all the reports were done and "we just don't have them, and we don't know why we don't have them." The court said it would send a new request to the state hospital for a section 6608 report. Simerly told the court that an attorney from the California Department of State Hospitals (DSH) previously explained how section 6608 "didn't precisely apply" but that the particular attorney was no longer with the department, so "I'm running into this morass." The court continued the matter to October 17, 2016 "for whatever appropriate report should be filed."

On October 17, 2016, Simerly informed the trial court that he received only one of the four expected evaluations and he was "getting a little frustrated not knowing where the other reports are." Simerly wanted the court to order production of the evaluations. The court responded, "I don't understand. I've never done an order with the hospital. They've always cooperated." The parties agreed that Simerly could serve a subpoena duces tecum for the reports. The court then addressed an attorney with the DSH who was in the courtroom on a different matter. The attorney agreed to cooperate with helping provide the reports for Kerins's case. The matter was continued to November 7, 2016.

On November 7, 2016, Simerly informed the trial court that the DSH told him that all of the evaluations had been sent to the court. The court said it only had one of the reports. The court said it would check "downstairs" because "sometimes they get mixed up with the subpoenas." Simerly reminded the court the evaluations were sent to the court as a result of a subpoena. The court continued the matter to November 21, 2016.

*November 2016 – October 2019: Representation by Richard Shikman*

On November 21, 2016, Simerly asked to withdraw from representing Kerins, telling the trial court, "I am on the cusp of retiring and the Bar Association is requesting that I transition out of cases earlier rather than later." The court granted Simerly's request and appointed Richard Shikman to represent Kerins. The court continued the matter to December 19, 2016. On December 19, 2016, Shikman was granted a continuance to January 23, 2017, because he "just got involved" and was still going through the case file.

On January 23, 2017, Shikman informed the trial court he was continuing Simerly's efforts to negotiate a resolution with the People. Shikman acknowledged, "We may not be successful in working this out, but we're attempting to try it and deal with the case." The court continued the matter to February 27, 2017. On February 27, 2017, the parties explained they were still working on a resolution. The court questioned whether a resolution was even possible in an SVP case. The deputy district attorney explained they were working on an "out-of-the-box" proposal. The court continued the matter to March 27, 2017.

On March 16, 2017, Shikman submitted a letter to the trial court explaining the proposed settlement, which contemplated a "dismissal which would be stayed." The letter states the proposal is supported by two evaluators who expressed opinions favorable to Kerins, although the reports

9

themselves are not in the record.  Then, at the March 27, 2017 hearing, the court mentioned there was an off-record, in-chambers meeting earlier in the day where the parties and court discussed the resolution and agreed to continue the matter to May 15, 2017.

For reasons not indicated in the record, the parties ceased their efforts at finding a resolution at some point following the March 27, 2017 hearing. At the May 15, 2017 hearing, the court asked if the parties were ready to set a trial.  Shikman responded that he had been in contact with Kerins, who requested a two-month continuance for trial setting.  The court continued the matter to July 17, 2017.

On July 17, 2017, Shikman requested a continuance because he was in another lengthy trial.  The trial court continued the matter to September 18, 2017.  On September 18, 2017, Shikman said he was preparing a motion to dismiss and requested a continuance.  The matter was continued to November 6, 2017.  On November 6, 2017, the court continued the matter to November 20, 2017, for trial setting because Shikman was still in trial on another case.

On November 20, 2017, Shikman said he was not ready to set trial because he was working on the motion to dismiss and had been collaborating with Kerins about the motion.  The trial court continued the matter to January 8, 2018.  On January 8, 2018, Shikman informed the court his motion was "fundamentally written" but that "I need to engage my client a little bit more.  I have engaged him.  I've met him.  I am in contact with him." The deputy district attorney had no objection to a continuance.  The matter was continued to February 26, 2018.  On February 26, 2018, the court scheduled a hearing on the motion to dismiss for April 9, 2018.  Shikman had

10

not yet filed the motion but was "about to file it," so the court was comfortable scheduling a hearing.

On April 9, 2018, the trial court held a hearing on Kerins's motion to dismiss. Kerins argued in the motion that the original SVP petition was filed on July 27, 2006, two days after his scheduled release date, and that the Department of Corrections and Rehabilitation (CDCR) did not have good cause to place a hold on Kerins under section 6601.3 beyond the release date. The trial court denied the motion after concluding the CDCR's hold was proper and that, in any event, the motion to dismiss was untimely because it was brought 12 years after the People filed the SVP petition. On April 30, 2018, Kerins filed a petition for writ of mandate in our court challenging the denial of his motion to dismiss. We summarily denied the petition on May 25, 2018.

While the writ petition was pending in our court, the trial court continued the matter until August 6, 2018. Upon Shikman's request, the court continued the matter for trial setting to September 17, 2018, and then November 5, 2018. There is no record of a hearing on November 5, 2018. On January 7, 2019, the court granted Shikman's request to continue the matter to February 25, 2019. There is no record of a hearing on February 25, 2019.

The next reported hearing occurred on July 22, 2019. Shikman informed the trial court that Kerins wanted the court to make an inquiry about whether a conflict existed between Shikman and Kerins. The court scheduled a hearing for August 14, 2019, to consider the matter. On August 14, 2019, the court held a hearing to address the conflict raised by Kerins. Kerins appeared by video. The court closed the courtroom. The record does not indicate what took place during the closed proceedings. On September 30, 2019, with Kerins present through video, the court found

11

good cause to relieve Shikman as counsel. The court set a further hearing on October 30, 2019, to appoint new counsel.

### *October 2019 – Present: Representation by Jay Dyer*

On October 30, 2019, the trial court appointed Jay Dyer to represent Kerins. Kerins was ill and could not attend the hearing via videoconference. The court scheduled a hearing for December 16, 2019, so that Kerins could be present.

On December 16, 2019, Dyer requested a further status conference for March 23, 2020. Dyer stated, "[T]his case looks like it will be requiring me to do a writ [of habeas corpus] or motion for dismissal." Dyer also told the trial court, "If I am not going to be asking for a trial on March 23rd, I will either have a waiver [of Kerins's speedy trial right] or I will tell you why I have good cause not to request a trial." The court continued the matter to March 23, 2020. On March 23, 2020, the court said the case "was on for video conference today, but it's not going to happen." The court continued the matter to April 27, 2020.

On May 11, 2020, Dyer filed a "waiver of presence and of trial." The document included a declaration from Kerins stating Kerins asked Dyer to "explore my legal remedies related to possible infringements of my Due Process and Equal Protection rights which I believe I have sustained during the life of my case. I have asked Dyer to delay my trial while he reviews and litigates these constitutional infringement issues."

On June 19, 2020, Dyer filed a motion to dismiss raising the issue about the custody hold from 2006, but with more details than the prior motion. The trial court held a hearing on September 14, 2020, on the motion. The court denied the motion for the same reasons it denied the prior motion.

12

On September 21, 2020, the People announced ready for trial. Dyer requested a continuance to file a petition for writ of habeas corpus "based on pretrial and constitutional delay." The trial court continued the matter to December 7, 2020. Then, on November 13, 2020, Kerins filed a petition for writ of habeas corpus in the trial court arguing that the People did not bring him to trial in a timely manner. Kerins also argued he was denied effective assistance of counsel. Kerins also filed a time waiver while the habeas petition was being considered.

The trial court denied the habeas petition on November 9, 2021. The court described the delay in commencing trial a "considerable one," but that the "overwhelming reason" for the delay was that Kerins's counsel sought "continuance after continuance." The court further observed that Kerins did not assert his right to a speedy trial until 2019, and that while Kerins "presumably experienced anxiety and concern" as a result of his continued incarceration, nothing in the record indicated Kerins's defense had been impaired. On balance, the court concluded Kerins had not suffered a violation of his speedy trial right.

### Court of Appeal Proceedings

On June 2, 2022, Kerins, still represented by Dyer, filed the instant petition for writ of habeas corpus. Kerins makes three arguments in his petition. First, he argues the SVP petition must be dismissed for lack of jurisdiction because the parole board's hold on Kerins from 2006 before the SVP petition was filed was unlawful. Second, he argues the SVP petition must be dismissed because he has suffered an unconstitutional pretrial delay. Third, he argues he was denied the effective assistance of counsel because his attorneys "did not move his case forward or prepare it for trial." We solicited preliminary briefing, and then issued an order to show cause.

13

## II. DISCUSSION

### A. *Filing of the SVP Petition After Kerins's Release Date*

Kerins argues that the SVP petition must be dismissed for lack of jurisdiction because the People filed the petition on July 27, 2006, which was two days past Kerins's scheduled release date. Kerins acknowledges that on July 24, 2006, the parole board placed a 45-day hold on Kerins pursuant to section 6601.3, which states that the parole board, upon "a showing of good cause," may hold an inmate 45 days past his release date in order to complete a "full evaluation" to determine if the inmate may qualify as an SVP. (§ 6601.3, subd. (a).) Kerins, however, contends he was held past his release date without good cause, which deprived the court of jurisdiction to entertain the SVP petition that the People subsequently filed.

We note initially that the record is conflicting as to whether the People filed an SVP petition before or after Kerins's July 25, 2006 scheduled release date. The copy of the SVP petition in the record before us contains an endorsed-stamp date of July 27, 2006. But a transcript of a hearing on July 24, 2006, indicates that the People filed a petition at the conclusion of that hearing. The transcript also includes a comment by the deputy district attorney suggesting the People submitted a petition on July 20, 2006, to the court for filing. Finally, a court detention order dated July 24, 2006, states that a petition to commit Kerins as an SVP had been filed previously.[2]

We need not resolve these discrepancies in the record because even if the People filed the petition on July 27, 2006, after Kerins's release date, the trial court did not lack jurisdiction to consider the SVP petition. First, we

---

[2] The Attorney General's unopposed motion to augment the record to include the July 24, 2006 detention order is granted. (Cal. Rules of Court, rule 8.155(a)(1)(A).)

14

agree with the trial court that Kerins's motions to dismiss based on the People filing the petition after Kerins's release date were untimely because the motions were brought 12 years and 14 years respectively after July 2006. (Accord, *People v. McGhee* (1987) 193 Cal.App.3d 1333, 1344 [criminal defendant waived right to dismiss criminal action on ground that information was belatedly filed when defendant moved to dismiss over 14 months after information was filed on the first day of trial].)

In addition, the 45-day hold the parole board placed on Kerins on July 24, 2006, was justified under then-current law. The parole board found good cause to detain Kerins based on the likelihood he would engage in sexually violent behavior without treatment. This finding was in line with title 15 of the California Code of Regulations, section 2600.1, subdivision (d), which defined "good cause" as "[s]ome evidence" that a person has a qualifying conviction and is "likely to engage in sexually violent predatory criminal behavior." (Cal. Code Regs., tit. 15, § 2600.1, subd. (d)(2).) In 2012, the California Supreme Court held in *In re Lucas* (2012) 53 Cal.4th 839 that this definition of "good cause" was invalid because it linked good cause to showing that the person is likely to be an SVP, rather than showing justification for the delay in filing the petition. (*Id.* at pp. 849–851.) Nevertheless, the court found the parole board's prior reliance on the regulation was excusable as a "good faith mistake of law." (*Id.* at p. 852.) Similarly here, the parole board could rely on the same regulation in July 2006 to support its good-cause finding and place a hold on Kerins. We therefore decline to direct dismissal of the SVP petition for lack of jurisdiction.

15

**B. *Kerins's Right to a Speedy Trial***

Kerins argues the SVP petition must be dismissed because the People's failure to bring him to trial 14 years after filing the SVP petition amounts to an unconstitutional pretrial delay.

"The [Sexually Violent Predator Act (SVPA)] does not establish a deadline by which a trial on an SVP petition must be held after the trial court finds probable cause to believe the inmate is an SVP." (*People v. Superior Court* (*Vasquez*) (2018) 27 Cal.App.5th 36, 57 (*Vasquez*).) "Nevertheless, '[b]ecause civil commitment involves a significant deprivation of liberty, a defendant in an SVP proceeding is entitled to due process protections.' [Citation.] This includes the due process right to a *timely* trial." (*People v. Tran* (2021) 62 Cal.App.5th 330, 347 (*Tran*).)

In assessing an SVP defendant's speedy trial claim, courts of appeal have applied the balancing test used in criminal speedy trial cases articulated in *Barker v. Wingo* (1972) 407 U.S. 514, as well as the more general balancing test from *Mathews v. Eldridge* (1976) 424 U.S. 319. (See *Vasquez, supra*, 27 Cal.App.5th at pp. 60, 81; *People v. Bradley* (2020) 51 Cal.App.5th 32, 40, 43; *People v. DeCasas* (2020) 54 Cal.App.5th 785, 806, 812 (*DeCasas*); *In re Butler* (2020) 55 Cal.App.5th 614, 648, 663 (*Butler*); *Tran, supra*, 62 Cal.App.5th at pp. 348, 354.) The trial court here applied both tests. "We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial pretrial delay." (*Vasquez, supra*, 27 Cal.App.5th at p. 55.) "Under this standard, we review the trial court's findings of fact for substantial evidence and its conclusions of law de novo." (*DeCasas, supra*, 54 Cal.App.5th at pp. 801–802.)

### 1. Barker *Test*

We begin with the balancing test from *Barker*. "[T]o determine whether a speedy trial violation has occurred, *Barker* established a balancing test consisting of 'four separate enquiries: whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result.'" (*People v. Williams* (2013) 58 Cal.4th 197, 233 (*Williams*).) "None of these four factors is 'either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.' [Citation.] The burden of demonstrating a speedy trial violation under *Barker*'s multifactor test lies with the defendant." (*Ibid.*)

### a. Length of the Delay

We measure the length of the delay in this case at approximately 14 years, from July 2006 when the People filed the SVP petition, to May 2020 when attorney Jay Dyer filed on behalf of Kerins a "waiver of presence and of trial," which included a declaration from Kerins stating he asked Dyer to "explore my legal remedies" and "delay my trial." The 14-year delay is extraordinary and weighs heavily in favor of Kerins's argument that his speedy trial rights have been violated. (See *Tran*, *supra*, 62 Cal.App.5th at pp. 348–349 [11-year delay weighed in defendant's favor]; *Butler*, *supra*, 55 Cal.App.5th at p. 648 [13-year delay was extraordinary]; *DeCasas*, *supra*, 54 Cal.App.5th at p. 806 [13-year delay was extraordinary]; *Vasquez*, *supra*, 27 Cal.App.5th at p. 61 [17-year delay was extraordinary].)

17

### b. Reasons for the Delay

"[T]he cause of the delay is the pivotal question for our due process inquiry." (*Vasquez*, *supra*, 27 Cal.App.5th at p. 64.) In considering the reasons for a delay, "different weights should be assigned to different reasons." (*Barker*, *supra*, 407 U.S. at p. 531.) "Deliberate delay 'to hamper the defense' weighs heavily against the prosecution. [Citation.] '[M]ore neutral reason[s] such as negligence or overcrowded courts' weigh less heavily 'but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.'" (*Vermont v. Brillon* (2009) 556 U.S. 81, 90.) "In contrast, delay caused by the defense weighs against the defendant." (*Ibid.*) "Because 'the attorney is the [defendant's] agent when acting, or failing to act, in furtherance of the litigation,' delay caused by the defendant's counsel is also charged against the defendant." (*Id.* at pp. 90–91.) "The general rule attributing to the defendant delay caused by assigned counsel is not absolute. Delay resulting from a systemic 'breakdown in the public defender system,' [citation] could be charged to the State." (*Id.* at p. 94.)

In this case, the trial court found that the "overwhelming reason" for the delay was that Kerins's counsel sought "continuance after continuance." Thus, the "great majority" of the delay could not be attributed to the state. We review the trial court's findings for substantial evidence. (*DeCasas*, *supra*, 54 Cal.App.5th at pp. 801–802.)

#### i. *The Defense*

Kerins argues the record here reveals a systemic breakdown in the defense of his case. He asserts that "court-appointed attorneys, selected and installed by the court, failed to prepare his case while they sought continuances year after year. And the futile attempts to secure pre-

commitment conditional release lacked any grounding in law; all the resulting delay was time thoroughly wasted."

There is no dispute that Kerins and his attorneys are responsible for the vast majority of the continuances in this case. During Harold Rosenthal's representation from August 2006 to April 2011, the trial court continued the matter dozens of times, and there is no indication in the record that Kerins objected to any of the continuances. For continuances whose reasons are reflected in the record, Kerins was responsible for all but one of them. Many of the continuances were requested for Kerins's benefit, such as allowing Rosenthal to consider whether to move for a new probable cause hearing, and providing more time for Kerins to receive treatment at the state hospital and for doctors to perform follow-up examinations. The trial court also granted a number of other continuances to accommodate Rosenthal's schedule, or because Rosenthal did not appear at a scheduled hearing.

Kerins and his attorneys were also responsible for the vast majority of continuances between May 2011 and October 2019 when he was represented by David Simerly and Richard Shikman, two attorneys appointed from the state conflicts bar. The court granted continuances between May 2011 and July 2012 so that Simerly could review information he received from Rosenthal, and also for a defense expert to evaluate Kerins. Between April 2013 and August 2015, the court granted a series of continuances after Kerins requested that Simerly pursue options for filing motions. Then, between October 2015 and November 2016, the court continued the matter several times after Simerly informed the court that Kerins and the People were exploring a resolution to the case that would involve Kerins's release. The situation was similar after Shikman replaced Simerly as Kerins's attorney in November 2016. Shikman requested multiple continuances

between his appointment and May 2018 so he could get up to speed on the case, then continue efforts at a resolution, and then prepare a motion to dismiss. Shikman requested additional continuances until July 2019, when he informed the court that Kerins wanted the court to determine whether a conflict existed between Kerins and Shikman.

Finally, Kerins was responsible for the continuances from October 2019 when Jay Dyer was appointed until May 2020 when Kerins formally entered a time waiver for trial, with Dyer expressing an intent to prepare a motion to dismiss and petition for writ of habeas corpus.

We disagree with Kerins that the multiple continuances requested and agreed to by his attorneys reveal a systemic breakdown in his defense. The circumstances described above are a far cry from *Vasquez* and *DeCasas*, where the existence of systemic breakdowns within the Los Angeles County Public Defender's office was a significant factor in the appellate courts' decisions to uphold the dismissal of the SVP petitions. In *Vasquez*, the court upheld the trial court's finding that the final three years of a 17-year delay resulted from a systemic breakdown in the public defender system. (*Vasquez*, *supra*, 27 Cal.App.5th at p. 73.) Beginning in October 2014, the defendant's attorney "repeatedly raised with the trial court her inability to prepare for trial given the 50 percent cut in her office's staff and her increased workload." (*Id.* at p. 71.) The attorney was ready to proceed to trial in January of 2017, but prior to the trial date, the public defender's office transferred her out of the SVP unit. (*Ibid.*) Two different attorneys from the public defender's office subsequently informed the court they would not be prepared for trial on the scheduled date. (*Id.* at pp. 51, 71.) The trial court then granted the defendant's motion to relieve the public defender's office as his counsel, and his new appointed attorney eventually filed a motion to dismiss on

20

August 25, 2017.  (*Id.* at p. 71.)  Based on these circumstances, the court concluded that "the trial court did not err in finding '[t]he dysfunctional manner in which the Public Defender's Office handled [the defendant's] case was precisely the type of systemic or institutional breakdown' " that placed the fault for the delay in the hands of the state, rather than the defendant.  (*Id.* at p. 73.)

Similarly, in *DeCasas*, the court upheld the trial court's finding that the final years of a 13-year delay were caused by the same staff reduction at the Los Angeles County Public Defender's Office that existed in *Vasquez*.  (*DeCasas*, *supra*, 54 Cal.App.5th at p. 810.)  The defendant's attorney "testified that the fact that public defenders were delaying their cases as a result of the staffing cuts was not a 'secret.  It was very, very open and it was said in open court repeatedly by many, many public defenders.' " (*Id.* at pp. 796–797.)  The attorney became " 'overwhelmed' " and his schedule did not allow for him to prepare for trial.  (*Id.* at p. 797.)  Thus, the court concluded that substantial evidence supported the trial court's finding "that a systemic breakdown in the public defender's office caused delays in SVPA cases," including the defendant's case.  (*DeCasas*, *supra*, 54 Cal.App.5th at p. 810.)

Nothing in the record here reflects a similar failure of the public defense system.  Nor has Kerins pointed to any funding shortage or institutional problems in the bar panel assignment process that compares to the 50 percent funding cuts and attendant staffing shortages at issue in *Vasquez* and *DeCasas*.  Instead, in the first five years of this case, Kerins was represented by retained counsel, Harold Rosenthal.  While Rosenthal requested multiple continuances due to scheduling conflicts (and in some cases failed to appear in court), nothing in the record suggests that those

21

continuances arose from systemic or institutional issues, rather than circumstances specific to Rosenthal. Kerins's next two attorneys, David Simerly and Richard Shikman, were appointed from the county's conflicts bar, and while each attorney requested multiple continuances, neither blamed systemic issues with defending SVP cases as the reason. Simerly and Shikman ceased representation of Kerins for individual reasons as well, with Simerly retiring and Shikman withdrawing due to a conflict in the attorney-client relationship. Kerins's current attorney, Jay Dyer, was also appointed from the conflicts bar and quickly began preparation of a motion to dismiss and petition for writ of habeas corpus after his appointment.

Kerins's case is also distinguishable from *Butler*, where the court, in affirming the dismissal of an SVP petition, found that substantial evidence supported the trial court's conclusion that the "bulk of the delay" was the state's responsibility. (*Butler*, *supra*, 55 Cal.App.5th at p. 658.) While the defendant's attorneys requested or agreed to over 50 continuances, there was "abundant evidence to support the habeas corpus court's finding that [the defendant's] public defenders essentially ignored and disregarded his demands for a timely trial and his express direction that counsel was not authorized to waive time on his behalf." (*Ibid.*) This led the trial court to conclude that "it would be fundamentally unfair to hold [the defendant] personally and solely accountable for delays caused by his counsel under such circumstances." (*Ibid.*) The record here does not show that Kerins's attorneys ignored his demands for trial or ever made continuance requests that were contrary to his wishes.

The absence of evidence showing a systemic breakdown makes this case similar to *Tran*, which affirmed a trial court's denial of a defendant's motion to dismiss on speedy trial grounds. The defendant in *Tran* placed the blame

22

for an 11-year delay on specific acts by his various attorneys over the course of the case, such as "failing to take steps to ensure an earlier probable cause hearing; not timely reassigning the case when [an attorney's] retirement was imminent; requesting continuances to research and prepare motions that were never filed; and not timely obtaining the reporter's transcripts of the first trial." (*Tran*, *supra*, 62 Cal.App.5th at p. 350.) The court explained that the "fundamental problem" with the defendant's argument was the lack of evidence showing " 'a systemic "breakdown in the public defender system." ' " (*Ibid*.) "Without a more developed factual record," the court explained, "we cannot make a determination whether the defense delays were justifiable, or 'whether the lack of progress was attributable to each attorney's own inability to properly manage or prioritize his or her caseload, or whether the performance of individual attorneys was indicative of unreasonable resource constraints, misallocated resources, inadequate monitoring or supervision, or other systemic problems.' " (*Id.* at p. 352, quoting *Williams*, *supra*, 58 Cal.4th at p. 249.) "Accordingly, we must attribute all delays caused by defense counsel to defendant." (*Tran*, at p. 350)

Likewise here, the absence of evidence in the record showing systemic issues with Kerins's defense compels us to attribute the delays caused by Kerins's attorneys to Kerins himself. "[I]n the absence of evidence identifying *systemic* or *institutional* problems and not just problems with individual attorneys, we are unable to conclude . . . that the delay experienced by defendant resulted from a breakdown in the public defender system. In other words, the record before us contains no facts about the public defender *system* that would support a finding of a *systemic* breakdown." (*Williams*, *supra*, 58 Cal.4th at p. 249.)

ii. *The People*

Kerins acknowledges that the record shows no deliberate attempt by the People to interfere with his defense, but he does assert the People bear some level of blame for the delay because they joined in several continuance requests "without asking the court to inquire, set deadlines, or find good cause for delays."

"[T]he People's due process obligation in an SVPA proceeding requires that it diligently prosecute the case. This may entail stating on the record that it is prepared to go to trial, taking affirmative steps to set a trial date, promptly requesting clinical evaluations and records, and securing the attendance of witnesses in a timely manner." (*Butler*, *supra*, 55 Cal.App.5th at p. 655.) The record here does not show that the People worked proactively to move the case to trial, such as by objecting to continuance requests, declaring ready for trial during the 14-year delay, or insisting that the trial court find good cause before granting Kerins's repeated continuance requests. (E.g., *Vasquez*, *supra*, 27 Cal.App.5th at p. 64 [prosecution not responsible for delay when, after several years of delays, it "repeatedly objected to continuance of the trial date" and "urged the trial court to remove the public defender's office and appoint new counsel"]; *Tran*, *supra*, 62 Cal.App.5th at p. 352 [" 'the district attorneys assigned to the case often expressed their readiness for trial and expressed displeasure with the long delays primarily caused by [defendant]'s attorneys.' "].) On the other hand, the record does not show that the People requested any unwarranted continuances or engaged in any tactics designed to delay trial. (E.g., *Butler*, *supra*, 55 Cal.App.5th at p. 656 [prosecution requested five-month continuance of probable cause hearing without explanation and delayed 10 months in requesting updated evaluations].) Instead, the People requested only three continuances in this

24

case totaling approximately five months: from August 1, 2008 to September 10, 2008, when the assigned deputy district attorney left the district attorney's office; from March 28, 2011 to May 25, 2011, when the People requested updated evaluations; and from July 18, 2012 to September 12, 2012, when the deputy district attorney had a family emergency. Kerins did not object to these continuances and does not contend the continuances were unsupported by good cause.

### iii. *The Trial Court*

Kerins also faults the trial court for delays because it granted dozens of continuances without requiring counsel to provide good cause.

The "trial courts must be vigilant in protecting the interests of the defendant, the prosecution, and the public in having a speedy trial." (*Williams*, *supra*, 58 Cal.4th at p. 251.) For example, " 'it is entirely appropriate for the court to set deadlines and to hold the parties strictly to those deadlines unless a continuance is justified by a concrete showing of good cause for the delay.' " (*Ibid.*)

The trial court bears some responsibility for the delay in this case. Over the course of 14 years, the trial court granted every continuance request, oftentimes without a finding of good cause (at least as reflected in the record). Other than one occasion in 2010 when it commented, "We have put this over several times, more than I can count on my hand," the court never expressed concern about delay in bringing Kerins to trial. Nor did the court inquire with Kerins directly whether he agreed to the delay. Kerins may not have been seeking a speedy trial if, for example, the evaluations supported his commitment as an SVP. But because the court never inquired, we do not know with certainty.

In this regard this case is similar to *Vasquez*, where, during the first 14 years of the defendant's confinement, his case was continued over 50 times without the record reflecting whether the trial court made a finding of good cause for the continuances. (*Vasquez*, *supra*, 27 Cal.App.5th at pp. 74–75.) There was also no "record of any inquiry by the trial court as to why the case was dragging on for so many years." (*Id*. at p. 75.) This case is also similar to *DeCasas*, where there was " 'no record of the court engaging in a consideration of whether good cause existed for each of the requests to continue between 2006 and 2018, only of it ever ordering the parties to appear on the next agreed-upon date.' " (*DeCasas*, *supra*, 54 Cal.App.5th at p. 810; see *Butler*, *supra*, 55 Cal.App.5th at p. 660 [delay attributable to trial court when matter was continued over 50 times without evidence that the trial court required counsel to show good cause, or that trial court made an on-the-record finding of good cause].)

In other respects, however, the trial court does not share the same level of responsibility for delays as the trial courts in *Vasquez* and *DeCasas*. In *Vasquez*, the appellate court was "particularly troubled" by the delay starting in October 2014, when the defendant's attorney first reported to the trial court she needed more time to prepare for trial in light of the staffing cuts at the public defender's office. (*Vasquez*, *supra*, 27 Cal.App.5th at p. 75.) The trial court "made its intention known" to set trial in 90 days, but did not do so. Instead, the court repeatedly continued the case at the public defender's request and did not relieve the public defender's office until two years later in November 2016. (*Id*. at pp. 75–76.) The trial court "could have acted sooner" and "should have considered whether to remove the public defender's office so that an attorney with adequate time to prepare the case could assume [the defendant's] representation. Indeed, the trial court ultimately took this

26

action, but not until almost two years had passed." (*Id.* at pp. 76–77.) Similarly, in *DeCasas*, the trial court "enabled and compounded the delays" caused by staffing cuts by failing to hold parties strictly to deadlines. (*DeCasas*, *supra*, 54 Cal.App.5th at p. 810.) The trial court in *DeCasas*, "despite 'the knowledge that the entire [SVP unit] was struggling with enormous caseloads, . . . did not inquire whether [DeCasas's] counsel had the ability to adequately prepare for trial or whether [DeCasas] would rather continue with [his assigned counsel] and move at a slower pace or appoint new counsel and move quickly to trial, nor did it consider removing the [p]ublic [d]efender's [o]ffice until 2018, nearly four years after first learning of the dramatic staffing cuts and the unit's ensuing struggle.' " (*Ibid.*)

The trial court here, unlike the courts in *Vasquez* and *DeCasas*, was not presented with information from Kerins's counsel indicating that counsel lacked the resources to prepare Kerins's case for trial. Moreover, the bulk of continuances requested by Kerins's counsel appeared designed to *avoid* trial. Early in Kerins's case in 2008 and 2009, Rosenthal requested continuances so Kerins could receive additional treatment in the state hospital and doctors could perform follow up evaluations. Beginning in April 2013, Simerly requested and was granted continuances to "explore" and then prepare motions, per Kerins's request. Then, in October 2015, Simerly sought continuances as Kerins and the People worked toward reaching a resolution of the case. Shikman continued those efforts in 2016 and 2017 after he replaced Simerly as counsel. After those efforts failed, Shikman, with Kerins's consent, began preparing a motion to dismiss in November 2017, filed the motion in March 2018, then filed a writ petition in our court challenging the trial court's ruling, which we denied in May 2018. After replacing Shikman as attorney in October 2019, attorney Dyer worked up

27

and filed a motion to dismiss and petition for writ of habeas corpus. While it is possible the trial court could have been more vigilant in moving proceedings along, we can only hold the trial court responsible to a limited extent for the delays given the multitude of continuance requests that were designed to resolve Kerins's case without a trial.

In sum, Kerins, the People, and the trial court all bear some responsibility for the delays in this case. But given that Kerins's attorneys requested the vast majority of continuances in this case with the apparent purpose of avoiding a trial, together with the lack of evidence showing a systemic breakdown of his defense, substantial evidence supports the trial court's conclusion that the "great majority" of the delay in this case cannot be attributed to the state and instead lies with Kerins.

### c. Kerins's Assertion of His Speedy Trial Right

"The defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right," and a "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." (*Barker*, *supra*, 407 U.S. at pp. 531–532.) " 'The issue is not simply the number of times the accused acquiesced or objected; rather, the focus is on the surrounding circumstances, such as the timeliness, persistence, and sincerity of the objections, the reasons for the acquiescence, whether the accused was represented by counsel, the accused's pretrial conduct (as that conduct bears on the speedy trial right), and so forth. [Citation.] The totality of the accused's responses to the delay is indicative of whether he or she actually wanted a speedy trial.' " (*Williams*, *supra*, 58 Cal.4th at p. 238.)

Kerins does not claim that he ever asserted his right to a speedy trial during the 14-year delay. Instead, he argues he could not have realistically

28

asserted his right to a speedy trial because he was not brought to court after the May 2007 probable cause hearing. Even if we take Kerins at his word that he was not present in court after May 2007,[3] the record still shows that Kerins was in contact with his attorneys throughout his case and never communicated to them that he wished to proceed to trial. Instead, the record indicates that Kerins authorized his attorneys to seek continuances throughout the case for a variety of reasons, such as allowing him to receive further treatment and evaluation at the state hospital, and allowing his attorneys time to pursue motions to dismiss and reach a resolution with the People. These circumstances are distinguishable from *Butler*, where the defendant made "sincere and repeated demands for a speedy trial . . . throughout his 12-year period of detention awaiting trial" via letters to the judge and to his attorneys. (*Butler*, *supra*, 55 Cal.App.5th at p. 635.) And, when the defendant in *Butler* did appear in court for a *Marsden*[4] hearing, he claimed that that the public defender's office had "failed to represent him competently by declining to bring his case to trial and that he had never agreed to any continuances." (*Butler*, at p. 633.) For the same reason, this case is also distinguishable from *Tran*, where the court, despite ultimately affirming the denial of a motion to dismiss, concluded that the defendant's assertion of his speedy trial right weighed in his favor when he "made numerous demands to speed up the proceedings and objections to his counsel's requests for continuances." (*Tran*, *supra*, 62 Cal.App.5th at p. 353.)

---

[3] The court minutes indicate that Kerins was in court several times between 2006 and 2011, but there is reason to doubt the accuracy of the minutes. Most notably, the minutes for the November 8, 2010 hearing contain a checked box stating Rosenthal was present, but the text of the minutes states "DEFENSE ATTORNEY IS NOT PRESENT."

[4] *People v. Marsden* (1970) 2 Cal.3d 118.

Kerins also argues that even had he been brought to court or given the opportunity to appear remotely, he would have faced the same "Hobson's choice" faced by the defendants in *Vasquez* and *DeCasas* of waiving his right to a speedy trial or demanding a speedy trial when his attorneys were not prepared to proceed. The choice faced by the defendants in *Vasquez* and *DeCasas* stemmed from the public defender's inability to prepare for trial due to staffing and budget cuts. (*Vasquez, supra*, 27 Cal.App.5th at p. 62; *DeCasas, supra*, 54 Cal.App.5th at p. 807.) But here, there is no evidence Kerins faced the similar undesirable choice of going to trial with unprepared attorneys or not going to trial at all, as nothing in the record suggests that Kerins's attorneys would have been unable to prepare for trial if Kerins had demanded one.

### d. Prejudice

We assess prejudice based on the "interests of defendants which the speedy trial right was designed to protect"—to wit, "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." (*Barker, supra*, 407 U.S. at p. 532.)

Here, 14 years of pretrial incarceration is "undoubtedly oppressive and would do little to minimize the anxiety and concern of the accused." (*Tran, supra*, 62 Cal.App.5th at p. 353.) We also have no reason to doubt Kerins's assertion that due to the delay in this case, he "has lost a decade and a half of his life as his health has worsened, and he has lost friends, family, opportunities to work, and any chance of living outside his hospital prison." However, there is no evidence that Kerins has suffered the " 'most serious' " type of prejudice—"the inability to adequately prepare his defense." (*Williams, supra*, 58 Cal.4th at p. 236.) Kerins, for example, does not contend

that the passage of time has resulted in the loss of evidence critical to the defense.  Nor has he asserted that a disposition at trial now would be less favorable to him than it would have in the past.  We therefore agree with the trial court that the prejudice factor "does not weigh strongly for or against" Kerins.

### e.  Summary of the *Barker* Factors

Without doubt, the length of the delay in this case cuts sharply in Kerins's favor.  But that factor does not overwhelm everything else in the calculus and on balance is not dispositive.  Substantial evidence supports the trial court's conclusion that Kerins did not assert his right to a speedy trial and is responsible for almost all of the delay in this case.  The final factor of prejudice at most weighs slightly in Kerins's favor.  Weighing all factors in their totality, we conclude the trial court was well within its discretion to reject his speedy trial claim under *Barker*.

### 2.  Mathews *Test*

We reach the same conclusion under the more general balancing test from *Mathews v. Eldridge, supra,* 424 U.S. 319.  Under *Mathews*, an analysis of "due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  (*Id.* at p. 335.)

Here, the private interest was a significant one, as Kerins has been subjected to a significant deprivation of liberty during his extended pretrial detention.  (See *Vasquez, supra,* 27 Cal.App.5th at p. 81 ["confinement for

31

17 years awaiting trial caused a significant deprivation of liberty"].) However, the record does not indicate that the risk of erroneous deprivation of Kerins's liberty interest is anything more than slight. The trial court found probable cause to commit Kerins as an SVP in 2007 and, despite being evaluated multiple times since then, Kerins has not cited or provided any specific evaluation stating he no longer meets the requirements of being considered an SVP. (See *Tran, supra*, 62 Cal.App.5th at p. 355 [risk of erroneous deprivation mitigated when defendant received a probable cause hearing and was reevaluated numerous times to assess whether he still met SVP criteria]; accord, *Vasquez, supra*, 27 Cal.App.5th at pp. 81–82 [risk of erroneous deprivation from negative evaluation and the defendant entering a treatment program]; *DeCasas, supra*, 54 Cal.App.5th at p. 813 [risk of erroneous deprivation when two psychologists opined the defendant did not fulfill a requirement of being an SVP].)

As to the government's interest, "[t]here is no question that 'the state has a compelling protective interest in the confinement and treatment of persons who have already been convicted of violent sex offenses, and who, as the result of current mental disorders that make it difficult or impossible to control their violent sexual impulses, represent a substantial danger of committing similar new crimes . . . .'" (*Tran, supra*, 62 Cal. App. 5th at p. 355.)

Given this balance of the *Mathews* factors, the trial court did not abuse its discretion in concluding that the "government's interest outweighs the risk of an erroneous deprivation of petitioner's liberty."

## C. *Ineffective Assistance of Counsel*

Separately, Kerins argues that his trial court attorneys provided ineffective assistance of counsel. Kerins asserts that his "attorneys did not

32

move his case forward or prepare it for trial. Their reasons for continuing his case were often left unstated; the reasons which do appear in the record for the most part served no legitimate tactical purpose, and the delay wasted fifteen years of . . . Kerins's life."

An SVP defendant has the right to effective assistance of counsel protected by both statute (see § 6603, subd. (a)) and the due process clause of the federal Constitution (see *People v. Hill* (2013) 219 Cal.App.4th 646, 652–653 ["although the right to effective assistance of counsel in SVPA proceedings is statutory, that right is protected by the due process clause of the federal Constitution"]). The parties agree that we should apply the two-part test from *Strickland v. Washington* (1984) 466 U.S. 668: "To establish ineffective assistance of counsel, a petitioner must demonstrate that (1) counsel's representation was deficient in falling below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation subjected the petitioner to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the petitioner." (*In re Wilson* (1992) 3 Cal.4th 945, 950, citing *Strickland v. Washington*, *supra*, 466 U.S. at p. 687; see *People v. Smith* (2020) 49 Cal.App.5th 445, 456 [applying *Strickland* test for ineffective assistance of counsel to SVP proceeding].) "When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Here, Kerins has offered no evidence to rebut the presumption that his attorneys provided reasonable assistance. Although Kerins claims that his various attorneys should have done more to "move the case forward," he has

not identified any specific decisions by his attorneys that should have been handled differently. Moreover, his attorneys had legitimate reasons for requesting continuances in many cases, such as providing more time for Kerins to receive further treatment at the state hospital and receive updated evaluations, accommodating the attorneys' medical needs and retirements, and providing the attorneys the opportunity to file motions to dismiss and engage in settlement discussions. In addition, pretrial delay will often work to a defendant's advantage in an SVP case; because the key issue in an SVP trial is whether the defendant *currently* suffers from a mental disorder that makes him a danger to society (see § 6600, subd. (a)(3)), an SVP defendant facing adverse evaluations may prefer to receive further treatment and be reevaluated rather than proceed to trial.

Accordingly, we conclude Kerins has not established a claim for ineffective assistance of counsel.

Although we have rejected Kerins's legal claims, we cannot condone the course of proceedings in his case. Kerins's attorneys, when requesting continuance after continuance, should have stated the reasons for the request on the record and kept the trial court and district attorney informed whether Kerins consented to the continuances. The district attorney should have objected to any continuance that was not supported by good cause, and also taken proactive measures to push the case toward trial. (See *Butler*, *supra*, 55 Cal.App.5th at p. 655.) And the trial court should have strictly held the parties to deadlines absent a showing of good cause, and inquired whether Kerins consented to the repeated continuances. "[T]rial courts must be vigilant in protecting the interests of the defendant, the prosecution, and the public in having a speedy trial." (*Williams*, *supra*, 58 Cal.4th at p. 251.) "As the 'captain of the ship,' the trial court cannot passively preside over a

34

case as it moves forward at a snail's pace without a trial date in sight."
(*Vasquez, supra*, 27 Cal.App.5th at p. 81.) We encourage the parties and trial court in this case—and in every SVP case—to take these simple measures to safeguard an SVP defendant's right to a speedy trial.

### III.  DISPOSITION

The petition for writ of habeas corpus is denied.

STREETER, Acting P. J.

WE CONCUR:

GOLDMAN, J.
WHITMAN, J.[*]

---

[*] Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:  Superior Court of California, City and County of San Francisco

Trial Judge:  Hon. Loretta Giorgi

Counsel:  Jay Dyer for Petitioner.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffery M. Laurence, Senior Assistant Attorney General, Catherine A. Rivlin, Supervising Deputy Attorney General, and Gregg E. Zywicke, Deputy Attorney General, for Respondent.

*In re Kerins* – A165304